Argued and submitted En Banc May 3, 1996; consolidated and reargued with *State v. Cleveland* (S41302) and *State v. Fleetwood* (S41311), and resubmitted March 3, 1997, decision of Court of Appeals and judgment of circuit court reversed; case remanded to circuit court for further proceedings September 24, 1998

## STATE OF OREGON,
*Respondent on Review,*

*v.*

## LESLIE LEE TOEVS,
*Petitioner on Review.*

## (CC 10-94-01400; CA A85708; SC S42836)

964 P2d 1007

Eric R. Johansen, Deputy Public Defender, Salem, argued the cause for petitioner on review on May 3, 1996. Peter Gartlan, Deputy Public Defender, argued the cause on March 3, 1997, and filed a consolidated brief. With them on the briefs was Sally L. Avera, Public Defender.

Robert M. Atkinson, Assistant Attorney General, Salem, argued the cause for respondent on review on May 3, 1996. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General. Timothy A. Sylwester, Assistant Attorney General, argued the cause on March 3, 1997, and filed a consolidated brief. With him on the brief were Hardy Myers, Attorney General, Virginia L. Linder, Solicitor General, Michael D. Reynolds, Assistant Solicitor General, and Robert M. Atkinson, Rives Kistler, and Eleanor E. Wallace, Assistant Attorneys General.

Thomas M. Christ, Portland, filed a consolidated brief on behalf of *amicus curiae* ACLU Foundation of Oregon, Inc.

David G. Terry and David E. Groom, Salem, filed a consolidated brief on behalf of *amicus curiae* Oregon Criminal Defense Lawyers Association.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, and Durham, Justices.**

CARSON, C. J.

---

** Unis, J., retired June 30, 1996, and did not participate in this decision; Fadeley, J., retired January 31, 1998, and did not participate in this decision; Graber, J., resigned March 31, 1998, and did not participate in this decision; Kulongoski, J., did not participate in the consideration or decision of this case.

## CARSON, C. J.

This criminal case involves the application of ORS 810.410(3)(b) (1993),[1] which sets forth the authority of a police officer during the course of investigating a traffic infraction. After denying defendant's motion to suppress evidence found during a traffic stop, the trial court convicted defendant of unlawful possession of a controlled substance. Defendant appealed, and the Court of Appeals upheld the conviction. *State v. Toevs*, 137 Or App 529, 904 P2d 658 (1995). Defendant now asks this court to reverse that conviction. For the reasons that follow, we conclude that the officers' conduct in this case violated ORS 810.410(3)(b) (1993) and, consequently, that the evidence at issue must be suppressed. Accordingly, we reverse the decision of the Court of Appeals and the judgment of the trial court.

On December 8, 1993, at 12:40 a.m., Officer Smith of the Cottage Grove Police Department saw defendant operating a vehicle that did not have its headlights turned on, a Class B traffic infraction. ORS 811.515(1) and 811.520(3). Officer Solesbee, Smith's training officer, was with Smith. Smith stopped defendant's vehicle to investigate the traffic infraction, parking his patrol vehicle behind defendant's vehicle. Solesbee stepped out of the patrol vehicle and stood in front of it on the driver's side. Smith, meanwhile, approached the driver's side of defendant's vehicle and asked to see defendant's driver license, proof of insurance, and vehicle registration. Defendant produced them and explained to Smith that he thought that his headlights were on when, in fact, he had turned on only his parking lights.

Smith took defendant's documents and ran a check on them. Smith then learned from his dispatcher that defendant, who had a valid driver license, was on parole. Smith decided not to issue a traffic citation to defendant and switched off his overhead lights. Smith mentioned to Solesbee, however, that he wanted to search defendant's vehicle. Solesbee responded that he had had prior drug-related contact with defendant and thought that defendant was on

---

[1] ORS 810.410(3)(b) (1993) is set out in the text below.

parole for drug use. Solesbee further opined that, if Smith searched defendant's vehicle, he would find contraband of some sort.

Smith walked back to defendant's vehicle, returned defendant's documents, and told defendant that he was free to go. At that time, Smith had no reason to believe that defendant had engaged in criminal activity. Smith then asked defendant if he could search defendant's vehicle. Defendant asked Smith if Smith was accusing him of anything. Smith responded that he was not accusing defendant, but wondered why defendant would not consent to a search. Smith then asked if he could search both defendant and defendant's vehicle, and asked whether there were any drugs in defendant's vehicle. Defendant responded that he did not have any drugs and, again, did not consent to a search. That conversation, beginning from the time when Smith told defendant that he was free to go, lasted about 30 seconds.

Solesbee, who had been watching Smith and defendant from his position behind defendant's vehicle, then approached the driver's side of defendant's vehicle and interrupted the conversation between Smith and defendant. Smith stepped back and stopped his questioning. Solesbee asked defendant, in a "low key" and "friendly" manner, "if he had any dope in the vehicle." Defendant shielded his eyes, lowered his face, and answered "[n]o." At that point, Solesbee observed that defendant "appeared very fidgety, extremely nervous acting, excited in his body movements but not excited in his speech. His pupils were extremely dilated." In Solesbee's training and experience, he believed that defendant might have ingested methamphetamine.

Solesbee then stated to defendant that defendant would feel better about the situation if he were honest and told Solesbee that he had drugs in his vehicle, if indeed he did. Solesbee asked defendant again if he had any drugs in the vehicle. Defendant responded that "[t]here is a little in the truck." Solesbee then ordered defendant to get out of his vehicle. Smith searched the vehicle, following defendant's directions, and found a box under the driver's seat that contained a bindle of methamphetamine and several syringes.

Defendant was indicted for unlawful possession of a controlled substance. Before trial, he moved to suppress the evidence discovered during the search of his vehicle, contending, among other things, that the questioning by Smith and Solesbee, following the initial traffic stop, constituted either a continued detention or a separate stop, neither of which were permissible under ORS 810.410(3)(b) (1993). After hearing testimony from Smith, Solesbee, and defendant, the trial court denied defendant's motion. Based upon stipulated facts, the court then found defendant guilty, as charged.

Defendant appealed to the Court of Appeals, which affirmed in a per curiam opinion, citing only *State v. Bonham*, 120 Or App 371, 852 P2d 905 (1993). *Toevs*, 137 Or App 529. We allowed defendant's petition for review and heard oral argument.[2]

ORS 810.410(3) (1993) provided, in part:

"A police officer:

"* * * * *

"(b)   May stop and detain a person for a traffic infraction for the purposes of investigation reasonably related to the traffic infraction, identification and issuance of citation."[3]

---

[2] This case originally was argued and submitted in May 1996. In November 1996, the voters approved Ballot Measure 40 (1996), a "crime victims' rights" initiative that, among other things, would have created new constitutional limitations upon the suppression of evidence. Another oral argument was held in this case in March 1997, so that the parties could address issues concerning the retroactivity and validity of Measure 40, and its potential application to this case. Subsequently, in *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998), this court concluded that Measure 40 contained two or more amendments to the Oregon Constitution that must be voted upon separately and, consequently, that the measure was invalid in its entirety. Accordingly, Measure 40 no longer is an issue in this case.

The 1997 Legislature enacted legislation that, similar to Measure 40, created new limitations upon the suppression of evidence in certain circumstances. ORS 136.432 (1997); Or Laws 1997, ch 313, § 1. Because neither party has raised the issue whether that new legislation applies to this case, we do not address that issue here.

[3] The 1997 Legislature amended ORS 810.410(3). The amended version of the statute provides that, when investigating traffic stops, police officers may: (1) inquire into certain circumstances that give rise to reasonable suspicion of criminal activity; (2) inquire regarding the presence of weapons; and (3) request consent to search for certain items of evidence. ORS 810.410(3)(c) to (e) (1997). That

That statute "defines the authority of the police to respond to a traffic infraction; by implication, the statute proscribes any further action by the police * * *, unless [that further action] has some basis other than the traffic infraction." *State v. Porter*, 312 Or 112, 120, 817 P2d 1306 (1991). That is, ORS 810.410(3)(b) prohibits an officer from continuing to detain a person stopped for a traffic infraction after completing the investigation reasonably related to the infraction, unless the officer has some other reason, separate from the traffic stop, for doing so. *State v. Dominguez-Martinez*, 321 Or 206, 212, 895 P2d 306 (1995). Further, the statute prohibits a search or investigation that explores for evidence of other crimes or infractions not reasonably related to the traffic infraction. *Porter*, 312 Or at 120.

Defendant contends that Smith and Solesbee exceeded the scope of their authority under ORS 810.410-(3)(b) when they questioned him about possessing drugs and requested consent to search his vehicle. Defendant first argues that the officers' conduct constituted a continued detention that was not reasonably related to the traffic stop and, therefore, was unlawful under *Dominguez-Martinez*. Defendant also argues that, even if the traffic stop ended when Smith stated that he was free to go and the subsequent questioning constituted only a mere conversation or noncoercive encounter, such an encounter is not authorized in the context of a traffic stop, under ORS 810.410(3)(b). Alternatively, defendant argues that, if the traffic stop ended when Smith stated that he was free to go, then the subsequent questioning constituted a second stop under Article I, section 9, of the Oregon Constitution,[4] that was not supported by reasonable suspicion that defendant had engaged in any criminal activity.

The state responds that the traffic stop ended when Smith returned defendant's documents and told defendant

---

amended version of ORS 810.410(3) does not apply retroactively. Or Laws 1997, ch 866, §§ 5, 6. Our decision in this case concerns only the 1993 version of ORS 810.410(3), and all references to the statute in the text that follows are to that earlier version.

[4] Article I, section 9, of the Oregon Constitution, provides, in part: "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

that he was free to go. It follows, in the state's view, that the subsequent questioning constituted a mere conversation or noncoercive encounter that is not prohibited by ORS 810.410(3)(b). As we shall explain, we conclude that the traffic stop did not end when Smith returned defendant's documents and told defendant that he was free to go. Consequently, the subsequent questioning by Smith and Solesbee constituted a continued detention of defendant that violated ORS 810.410(3)(b), because it was neither reasonably related to the investigation of the traffic infraction, identification, or issuance of a citation, nor based upon some other reason, separate from the traffic stop.[5]

■■    As a preliminary matter, we must ascertain the proper methodology for determining whether a traffic stop either continued or ended under ORS 810.410(3)(b). That is, we must determine the legislature's intent when it provided that an officer "[m]ay *stop and detain* a person for a traffic infraction." (Emphasis added.) We first examine the text and context of the statute. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Context includes other provisions of the statute at issue and related statutes. *Id.* at 611. Case law interpreting the statute at issue also is considered at our first level of analysis. *Davis v. O'Brien*, 320 Or 729, 741, 891 P2d 1307 (1995). If the meaning of the statute is clear from its text and context, then we proceed no further. *PGE*, 317 Or at 611.

ORS 810.410(3)(b), which is part of the Oregon Vehicle Code, does not define the words "stop" and "detain." Our case law applying the statute also is not helpful, because the cases involved facts that were sufficiently clear without requiring that the court develop a methodology for making that determination. *See, e.g., Dominguez-Martinez*, 321 Or at 213 (officer unlawfully detained defendant by standing in open doorway of defendant's vehicle); *State v. Farley*, 308 Or 91, 94-95, 775 P2d 835 (1989) (officer unlawfully detained

---

[5] Because we conclude that the officers' actions constituted a continued detention under ORS 810.410(3)(b), we need not, and do not, decide whether that statute prohibits a police officer from engaging in mere conversation with a driver following the completion of a traffic stop.

defendant by requesting driver license and proof of insurance after reason for traffic stop no longer existed).

■ Other related statutory provisions, however, are instructive.[6] First, in addition to authorizing a police officer to "stop" and "detain" a person, ORS 810.410(3) also authorizes an officer to "make an *arrest* of a person *as authorized by ORS 133.310(2)* if the person is stopped and detained pursuant to the authority of this section." *Former* ORS 810.410(3)(c) (1993), *renumbered as* ORS 810.410(3)(g) (1997) (emphasis added). ORS 133.310(2) is part of the criminal procedure code and sets forth the authority to make warrantless arrests in certain circumstances. For the purpose of that statute, "arrest" is defined as follows:

> " 'Arrest' means to place a person under actual or constructive restraint or to take a person into custody for the purpose of charging that person with an offense. *A 'stop' as authorized under ORS 131.605 to 131.625 is not an arrest.*"

ORS 133.005(1) (emphasis added).

ORS 131.605 to ORS 131.625, which also are part of the criminal procedure code, provide definitions and set forth the authority of a peace officer to stop, detain, and frisk a person in contexts other than a traffic stop. According to *former* ORS 131.605(5) (1993), *renumbered as* ORS 131.605(6) (1997), "[a] *'stop'* is a *temporary restraint of a person's liberty* by a peace officer lawfully present in any place." (Emphasis added.) ORS 131.615(2) further provides that "[a] *detention* and inquiry [during the course of a lawful stop] shall be conducted in the vicinity of the stop and for no longer than a reasonable time." (Emphasis added.)

■■ It is evident that, in referring to specific provisions of the criminal procedure code in ORS 810.410(3), the legislature intended that certain legal terms that are common to both the vehicle code and the criminal procedure code, such as "stop" and "detain," would carry the same meaning and be

---

[6] One related statute, ORS 801.510, defines the word "stop" for purposes of the vehicle code. However, that definition, which applies "[e]xcept where the context requires otherwise," ORS 801.100, refers to the cessation from movement of a vehicle, rather than defining a type of police-citizen encounter. Therefore, that statutory definition is not helpful to our inquiry here.

interpreted in the same manner, unless otherwise provided. Nothing in the text or context of ORS 810.410(3)(b) points to a contrary conclusion, or even to a plausible alternative interpretation. Consequently, we conclude that, in using the words "stop" and "detain" in ORS 810.410(3)(b), the legislature was referring to a temporary restraint of a person's liberty and a continuation of such a restraint. We further conclude that our methodology for determining whether a stop either ended or continued must be the same under the vehicle code as under the criminal procedure code.

Consistent with the foregoing, we now explain our general methodology for determining whether an officer's contact with a citizen rises to the level of a stop or a detention under the criminal procedure code. This court has stated that, in enacting ORS 131.605 to ORS 131.625, the legislature intended to codify judicial decisions interpreting Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution.[7] *State v. Kennedy*, 290 Or 493, 496-97, 624 P2d 99 (1981). The analysis of a defendant's rights under those statutes, therefore, "is substantially the same as [an] analysis of [the defendant's] rights under the search and seizure provisions of the Oregon and Federal constitutions."[8] *Id.* at 497.

In *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991), this court explained that generally there are three categories of encounters between police officers and citizens: (1) a mere conversation or noncoercive encounter that involves no restraint of liberty and, therefore, is not a seizure that requires any justification; (2) a stop, which is a type of seizure that occurs when an officer temporarily restrains a person's liberty or freedom of movement, that must be justified by reasonable suspicion of criminal activity; and (3) an arrest, which also is a type of seizure, that must be justified by probable cause to believe that the person arrested has

---

[7] The relevant text of Article I, section 9, is set out at 327 Or at 531 n 4. The Fourth Amendment to the United States Constitution provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

[8] This court conducts a separate analysis, first under the state constitution and then under the federal constitution, if required. *See, e.g., State v. Ehly*, 317 Or 66, 77-91, 854 P2d 421 (1993) (so demonstrating).

committed a crime. As we have explained, a "detention," in this context, is the continuation of a "stop."

**8.** The court in *Holmes* held that a "seizure," which includes a stop, occurs under Article I, section 9, whenever a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* such a belief is *objectively reasonable* under the circumstances. *Id.* at 409-10; *see also State v. Ehly*, 317 Or 66, 76-77, 854 P2d 421 (1993) (applying that test under *former* ORS 131.605(5) (1993), *renumbered as* ORS 131.605(6) (1997)). The determination whether a stop occurred thus requires a fact-specific inquiry into the totality of the circumstances. *Holmes*, 311 Or at 408; *see also Ehly*, 317 Or at 76-77 (demonstrating such an inquiry under *former* ORS 131.605(5) (1993), *renumbered as* ORS 131.605(6) (1997)).

Because a detention is the continuation of a stop, that same analysis applies when determining whether an unlawful detention occurred following a lawful stop. *See State v. Juarez-Godinez*, 326 Or 1, 6-7, 942 P2d 772 (1997) (discussing case law governing stops of persons under Article I, section 9, in context of determining whether unlawful detention of property had followed lawful stop). In either circumstance, the central inquiry is whether an officer

> "engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries [that] a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Holmes*, 311 Or at 410.

The determination of a defendant's *subjective* belief under *Holmes* is a question of fact to be determined by the trial court. *See State v. Ford*, 310 Or 623, 638, 801 P2d 754 (1990) ("What actually transpired is a question of fact for the finder of fact."). The determination whether a defendant's subjective belief is *objectively reasonable*, however, requires an independent assessment of the facts by this court. *See State v. Gerrish*, 311 Or 506, 513, 815 P2d 1244 (1991) (court

independently determined whether defendant's belief was reasonable in the circumstances).

■     We now apply those principles to the facts of this case. At the outset, we note that the trial court made no written findings of fact. However, the record demonstrates that the court found that defendant subjectively believed that Smith and Solesbee significantly had restricted his freedom of movement, despite telling him that he was free to go,[9] and that that belief objectively was reasonable. However, believing to be bound by a Court of Appeals decision, *State v. Bonham*, 120 Or App 371, the trial court nonetheless denied defendant's motion.[10]

■     We now conduct an independent determination whether defendant's belief that the stop had not ended objectively was reasonable. In our view, the following facts are significant. First, after telling defendant that he was free to go, Smith immediately asked defendant if he could search the vehicle. He continued to do so, even though defendant did not give consent after the first request. He also asked defendant if defendant possessed any drugs. Second, while Smith was questioning defendant, Solesbee, who had had prior drug-related contact with defendant, was standing outside the patrol vehicle, behind defendant's vehicle on the driver's side. When it became apparent that Smith was unable to obtain defendant's consent to a search, Solesbee also approached defendant and interrupted Smith. Solesbee then asked defendant two more times if he had any drugs in the vehicle.

Under the totality of the circumstances, we conclude that a reasonable person in defendant's position could have believed that the officers significantly had restricted his liberty or freedom of movement. Indeed, the officers' continuous

---

[9] The evidence in the record supports that conclusion. Defendant testified that he never felt that he was free to leave and that, "[i]f I felt like I was free to leave, I would have left."

[10] In *Bonham*, a police officer had told the defendant that he was free to go, following a valid traffic stop, and then had asked the defendant for consent to search his vehicle. The defendant consented, and the ensuing search uncovered drugs and other evidence of criminal activity. 120 Or App at 373. A majority of the Court of Appeals concluded that the traffic stop ended when the officer told the defendant that he was free to go and that the subsequent request to search was permissible, because it did not rise to the level of a stop. *Id.* at 376-77.

show of police authority constituted conduct that was "significantly beyond that accepted in ordinary social intercourse." *Holmes*, 311 Or at 410. Therefore, through that conduct, they continued to detain defendant. *See State v. Painter*, 296 Or 422, 425, 676 P2d 309 (1984) ("[A] show of authority may suffice to convert a police-citizen encounter into a 'stop' of statutory proportion.").

The state contends that, because Smith told defendant that he·was free to go, the traffic stop ended before Smith began questioning defendant about possessing drugs. It is true that, when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed had ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's *conduct* after stating that a driver is free to go may *negate* such a statement. *See Dominguez-Martinez*, 321 Or at 208, 213 (officer who told defendant that he was free to go while leaning on open door of defendant's vehicle continued to detain defendant in violation of ORS 810.410(3)(b)).[11]

In sum, we conclude that the stop did not end when Smith returned defendant's documents and told him that he was free to go. Because the ensuing questioning was neither "reasonably related to the traffic infraction, identification [or] issuance of citation" under ORS 810.410(3)(b), nor based upon some other reason, separate from the traffic stop, the officers exceeded the scope of their authority under that statute when they continued to detain defendant.

Having concluded that the officers detained defendant in violation of ORS 810.410(3)(b), we now must determine whether the evidence discovered during the search of defendant's vehicle should have been suppressed. Under this court's case law, suppression is appropriate here:

> "* * * '[B]ecause the object of [ORS 810.410(3)] is to define the authority of officers to respond to a traffic infraction,' the evidence should be suppressed when police officers

---

[11] The state also contends that, because the conversation between Solesbee and defendant was "low key" and "friendly," their interaction could not be viewed as a stop. That fact does not change our conclusion that, under the *totality* of the circumstances, a reasonable person could have believed that the stop had not ended.

exceed that authority. [*Porter*,] 312 Or at 121. *See also State v. Davis*, 295 Or 227, 236, 666 P2d 802 (1983) ("[W]hen the object of the statute is to define the authority of officers to seize or to search a person or property * * * the court has drawn the logical consequence and has given effect to the statute *by denying the state the use of evidence that it would not have secured if its officer had respected the rights that the statute was designed to protect.*' (Emphasis added.))."

*Dominguez-Martinez*, 321 Or at 214 (emphasis in original; second and fourth brackets in original; second ellipses in original). Accordingly, we hold that the trial court erred when it denied defendant's motion to suppress.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings.