Argued and submitted September 27, 2007, reversed and remanded
August 13, 2008

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# VIKI CRICKETTE BROUGHTON,
*Defendant-Appellant.*

Washington County Circuit Court
C042323CR; A128177

193 P3d 978

Bronson D. James, Deputy Public Defender, argued the cause for appellant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Laura S. Anderson, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant appeals a judgment of conviction for possession of a controlled substance, Schedule II (methamphetamine), *former* ORS 475.992 (2003). Defendant assigns error to the trial court's denial of her motion to suppress evidence obtained during searches of her car and of her person. She argues that her consent to the searches was unlawfully obtained because it occurred during the impermissible extension of what began as a lawful traffic stop, but became an unlawful seizure because the police officers who conducted the searches lacked objective reasonable suspicion of criminal activity, as required by Article I, section 9, of the Oregon Constitution.[1] We review the trial court's denial of a motion to suppress for errors of law, *State v. Rider,* 216 Or App 308, 310, 172 P3d 274 (2007), *rev allowed,* 345 Or 94 (2008), and reverse and remand.

We are bound by the trial court's findings of historical fact if constitutionally sufficient evidence in the record supports those findings. *State v. Hall,* 339 Or 7, 10, 115 P3d 908 (2005). If the trial court did not make express findings respecting all pertinent historical facts, and the record contains conflicting evidence, then we presume that the trial court found facts that were consistent with its ultimate conclusion. *Id.*

The following facts are taken from the record and are not in dispute. We recite the facts in some detail because they inform our standard of review. At approximately 11:30 p.m. on June 23, 2004, Cornelius police officers Blood and Schmid were in two marked patrol cars watching a suspected drug house on South Alpine Street. That suspicion arose, in part, from information that Blood obtained approximately one year earlier from the owner of that house that his son was selling methamphetamine out of his bedroom.

Blood saw defendant park her car in front of the Alpine Street house. Blood recognized defendant because,

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

less than two weeks earlier, he had stopped her while she was driving the same car because the car had a malfunctioning brake light.

On the night in question, Blood's car was behind defendant's car, and he drove past her as she parked. He noted that both brake lights on defendant's car were working at that time. Blood drove on but continued to watch defendant through his rearview mirror. Blood watched defendant get out of the car and walk toward the house. Blood noted that defendant approached the house with nothing in her hands.

Blood parked his car around the corner from the house and told Schmid by radio what he had seen. Schmid was also watching the house from a different location. Schmid testified that he saw defendant's car pull up to the house and that the car remained parked for approximately one minute before it pulled away. Schmid radioed Blood that defendant's car was leaving, and Blood followed the car.

Defendant's car stopped at a traffic light, and Blood noticed that one of the car's brake lights was now not working. Blood activated the overhead lights on his marked police car, and defendant pulled over. Blood's overhead lights remained on for the duration of the incident. When Blood made contact with defendant, he recognized her as the same person he had pulled over two weeks earlier for a malfunctioning brake light. Defendant was calm, polite, and cooperative, and Blood observed that defendant was not showing any signs of being under the influence of controlled substances. Upon request, defendant gave Blood her driver's license and other required information, and he returned to his patrol car to check for outstanding warrants and license suspensions. Shortly after defendant was stopped, Schmid arrived to assist Blood. Blood estimated that it took "no more than two minutes" for him to check defendant's information through the Driver and Motor Vehicle Services (DMV) and Law Enforcement Data Systems (LEDS) databases. After learning that defendant had no outstanding warrants or license suspensions, Blood returned to defendant's car.

Blood had not, at that point, decided whether to cite defendant for the malfunctioning brake light. Blood did not

return defendant's driver's license to her upon his return to her car because he had not yet "finished" the traffic stop. However, at the time Blood returned to defendant's car, he had all the information he needed to issue a citation for a malfunctioning brake light.

Blood stated that he had two reasons for stopping defendant's car: (1) the malfunctioning brake light and (2) suspicion of drug activity because "she was coming from what [he] suspected might have been maybe a drug transaction [at the Alpine Street house]."

Upon returning to defendant's car, Blood told defendant that when he stopped her two weeks earlier, he saw defendant leaving the home of a convicted drug dealer. Blood then told defendant that he had just watched her visit a different suspected drug house for no longer than a minute. Defendant responded that she was returning clothes to someone at the Alpine Street house, a statement that Blood thought to be false because he saw that defendant was not carrying anything when she went into the house.

At that point, Blood asked defendant if there were any drugs in her car, and defendant answered, "No." Blood then asked for defendant's permission to search her car. Although defendant responded that he could search, she remained in the car. Blood told defendant that she would have to get out of the car before he could conduct the search. Defendant opened the car door and began to step out, but then stopped, remaining partially in the car with one foot outside. Defendant told Blood that she did not want him to search her car, that she had rights, and that he had no reason to search. Blood replied by asking defendant whether "she was going to let [him] search the car or not." In response, defendant got out of her car and stepped to the side. When Blood asked her if he had her permission to search the car she replied, "Yeah, I don't care." During the search of the car, Blood found drug paraphernalia, including hypodermic needles and residue. Blood administered an amphetamine field test on the residue, and it tested positive for amphetamine.

Next, Blood asked defendant if she had any drugs on her person. Defendant responded that she did not. Blood followed up by asking defendant if he could search her, and

defendant "muttered, 'yeah.' " Schmid conducted the search of defendant and found in her wallet a small plastic bag containing a white crystalline substance that he "recognized to be methamphetamine."

After Schmid discovered the plastic bag, Blood read defendant her *Miranda* warnings, and she indicated that she understood her rights. Blood cited defendant for possession of a controlled substance, Schedule II, and gave her a property evidence report. By this time, approximately 30 minutes had passed since Blood and Schmid first observed defendant visit the Alpine Street house.

Defendant moved to suppress the seizure of her person, all evidence from the search of her vehicle, and all oral derivative evidence. At the conclusion of the hearing on defendant's motion to suppress, the trial court stated:

> "I infer from the evidence that *Officer Blood was motivated more by his suspicion of drug activity* than simply stopping a car with a burned out brake light or a defective brake light * * *.

> "But the fact is that [Blood] saw [defendant] at what he and Officer Schmid thought was a house where drug dealing was going on and he has the additional fact that he had seen the same car a week or two before at the house of another person known to him to be a drug dealer. Certainly, *if all [Blood] was doing was issuing a traffic citation, he could have handed [defendant] back her license and issued the citation. And he acknowledges he didn't do that, but he had not completed the stop.*

> "[Blood] referred earlier to his suspicion about something about the drug activity that he doesn't contend he only stopped [defendant] because of the [brake] light. He did prolong the stop. There's no question about that. And if he had simply stopped her for the traffic matter and we had not had, particularly, (inaudible) two different houses suspected by the officers to be involved in drug [dealing].

> "One because of the resident they know to be a drug dealer at the first house a week or two earlier and then this second one that they were actually maintaining (inaudible) one of the officers maintained surveillance on. The very brief what appeared—I think the officer reasonably assumed was a visit to the house, because [Blood] saw the

defendant walking toward the house with nothing in her hands.

"*I conclude that* what occurred after [Blood] returned to the car, even though he hadn't decided whether or not he was going to cite [defendant] for the traffic light, *he was prolonging the stop because of his suspicion of drug activity.* And at the time he asked her—well, he first asked her—and I think this might have been even consistent with a traffic stop—something about going to the house of a—that he'd seen her at a house earlier of a person he knew to be a drug dealer and now he's seeing her in a house that he suspects there's drug activity and something to the effect of asking her what she was doing there.

"That whatever delay that caused, I would conclude—I'm trying to state legal conclusions as I go along * * * so even if I'm wrong, you don't have to go through this again in order to get more evidence or have a judge reach more conclusions or findings of fact.

"To the extent the questioning about telling [defendant] he'd seen her at another drug house, now asking her what she's doing at [Davis's] house, I think—I believe [Blood] said he told her he was suspicious of this house where she's now stopped. * * *

"But at any rate, that *the statement and the question to the extent that it prolonged the traffic stop, I don't think that it was improper had there been only the traffic stop, but here I find the fact that this was not just a traffic stop. [Blood] already had the suspicion and the issue then is: Is this a well-grounded suspicion or just hunch?*

"And I conclude, after finding these facts, that they are sufficient for—at least once she gives an answer that [Blood] knows is not true about what she's doing at the house. [Defendant] said she was dropping off clothes and [Blood] saw her and she wasn't carrying anything, so he knows now that she's given false answers as to what she's doing there. That at that point it warrants a stop, at least to inquire about drug activity. That is—it's not a case where [Blood is] obligated to tell [defendant] she's free to go on the traffic stop before asking further questions."

(Emphases added.) Following the trial court's denial of the motion to suppress, defendant agreed to a stipulated facts

trial. The court found defendant guilty and imposed a sentence of 18 months' probation. The sole issue on appeal is whether the trial court erred in denying the motion to suppress.

Article I, section 9, of the Oregon Constitution precludes unreasonable seizures. A traffic stop is a temporary seizure that occurs when an officer restrains a person's liberty or freedom of movement. *State v. Amaya*, 176 Or App 35, 43, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004). Traffic stops must be supported by reasonable suspicion that the person stopped has committed a traffic infraction. *Id.*

During a lawful traffic stop, an officer may, without violating Article I, section 9, question the driver about matters that are unrelated to the stop. *Amaya*, 176 Or App at 44. Questioning that occurs during, or prolongs the traffic stop beyond that reasonable time, however, is the functional equivalent of a new restraint of the driver's liberty, and is unlawful unless it is separately supported by reasonable suspicion that the driver has engaged in some further criminal activity. *Id.* Reasonable suspicion requires both a subjective belief by the police officer that the defendant has committed a crime and that the officer's subjective belief be objectively reasonable under the totality of the circumstances. ORS 131.605(5); *State v. Ehret*, 184 Or App 1, 7, 55 P3d 512 (2002).

In *State v. Rodgers*, 219 Or App 366, 182 P3d 209 (2008), we stated that inquiries unrelated to the initial traffic infraction can lead to unlawful restraint of a citizen's liberty in two circumstances. The first such circumstance occurs when an officer concludes a lawful stop and then initiates a second stop by questioning the person about matters unrelated to the lawful stop without reasonable suspicion. *See, e.g., State v. Toevs*, 327 Or 525, 529, 537, 964 P2d 1007 (1998) (an officer's further questioning about the defendant's possible possession of illegal drugs after informing the defendant that he was free to go was not reasonably related to the traffic infraction, was not independently justified, and required that the evidence be suppressed).

The second such circumstance occurs when an officer unlawfully questions an individual after a lawful traffic

stop by detaining that person beyond the time reasonably required to investigate the traffic infraction and issue a citation, without letting the individual know, either explicitly or implicitly, that she is free to leave. *See, e.g., Rodgers*, 219 Or App at 371.

This case presents the second circumstance and is factually similar to *Rodgers*. In that case, the defendant was pulled over after a police officer observed him driving a car with a burned-out license plate light. *Id.* at 368. During the course of collecting the defendant's license, registration, and proof of insurance, the officer made several observations that caused him concern. Specifically, the officer saw several items in the car that he believed were consistent with the manufacture of methamphetamine, as well as sores on the defendant's face that he believed to be consistent with methamphetamine use. Shortly thereafter, a second police officer arrived to assist with the stop, and the first officer shared with that officer his concern that defendant was involved in the manufacture of methamphetamine. *Id.*

The defendant's records check came back clear, and the first officer testified that he had everything he needed to issue a citation. However, instead of issuing a citation, both officers went back to the defendant's car and started asking him questions about the items of concern. The defendant and the officers engaged in an exchange about those items that lasted approximately two minutes, after which the police requested and received the defendant's consent to search the car. As a result of the search, the officers discovered additional items that led to the defendant's conviction for manufacture of a controlled substance. *Id.* at 368-69.

On appeal, the defendant argued that the police unlawfully extended what initially began as a lawful traffic stop when the officer "had everything he needed to issue a citation * * * and, instead of doing so, questioned defendant about the [items of concern] without reasonable suspicion that [he] had engaged in criminal activity." *Id.* at 369. We agreed with the defendant and concluded that evidence that derived from unlawful questioning after a lawful traffic stop has or should have terminated is subject to suppression unless the state can prove that the disputed evidence

(1) inevitably would have been discovered, (2) was independently discovered through lawful means, or (3) was sufficiently attenuated from the unlawful police conduct. *Id.* at 371.

In this case, defendant concedes that her encounter with the police began as a lawful stop based on a traffic infraction. However, defendant argues that once Blood was informed that defendant's records check was clear, he had to either issue a citation for the broken brake light or end the stop. Instead, Blood "recontacted" defendant, unlawfully extending the stop and detaining defendant by initiating a conversation on an unrelated topic.

We agree with defendant. At the point at which the officer learned that defendant's warrant and driving records were clear, he could have lawfully (1) issued a citation or (2) ended the stop by informing defendant that she was free to leave. When the officer chose instead to engage defendant in a conversation unrelated to the malfunctioning brake light, he extended the duration of the stop beyond the time reasonably required to investigate and prosecute the traffic infraction. In *Rodgers*, we stated:

> "[A]lthough an officer is free to question a motorist about matters unrelated to the traffic infraction during an unavoidable lull in the investigation, such as while awaiting the results of a records check, that officer is not similarly free to question the motorist about unrelated matters as an alternative to going forward with the next step in processing the infraction, such as the writing or issuing of a citation. When an officer has all of the information necessary to issue a citation but instead delays in processing it or in telling the motorist that he or she is free to go, the stop is no longer lawful unless the officer has reasonable suspicion of further criminal activity."

*Id.* at 372.

The state argues that Blood's comment to defendant that he had seen her leave the home of a convicted drug dealer and the home of a suspected drug dealer amounted only to "mere conversation" that occurred during the course of a valid traffic stop. Additionally, the state argues that "[t]here is no evidence that Blood kept defendant's driver

license any longer than would have been necessary to write a citation for defendant's traffic violation at the time" that Blood made those comments to defendant.

The state's argument is not persuasive. The officer had all the information he needed to cite defendant for the malfunctioning brake light. Instead of issuing the citation or informing defendant that she was free to leave, the officer delayed by doing neither while he contemplated whether or not to issue the citation. That delay was not an "unavoidable lull in the investigation" as we described in *Rodgers*. Rather, the officer engaged defendant in a conversation unrelated to the traffic stop that was not supported by reasonable suspicion of other criminal activity and that had the "effect of detaining defendant beyond a completed traffic stop[,]" resulting in an unlawful extension of what initially was a lawful traffic stop. *See Amaya*, 176 Or App at 43-44 (citing *Toevs*, 327 Or at 537). To allow an officer to elicit potentially incriminating information from a motorist while that officer considers whether to issue a citation allows an officer to extend a stop for too long. As we stated in *Rodgers*:

> "The state urges us to adopt a rule that would measure the reasonable duration of a traffic stop during which an officer chooses not to issue a citation by the time it would have taken to process a citation if the officer had chosen to do so. Such a rule, however, would in too many situations invite speculation and, for that reason, prove unworkable."

*Id.* at 373. Here, the state advances a similar argument: The time it would have taken Blood to issue defendant a citation equals the permissible duration of detention. For the same reasons we expressed in *Rodgers*, we decline to adopt such a rule.

The second reason that we are not persuaded by the state's argument relates to Blood's testimony. At the suppression hearing, defense counsel elicited the following testimony:

> "[DEFENSE COUNSEL]: Okay. And the reason for the stop was an ordinary traffic stop, fair to say?

"[BLOOD]: Well, that—well, that and she was coming from what I suspected might have been maybe a drug transaction.

"[DEFENSE COUNSEL]: Okay, but you didn't see anything happen at the house?

"[BLOOD]: No."

Based on that exchange, and consistent with the trial court's findings, it is evident that Blood had two reasons for stopping defendant: (1) defendant's malfunctioning brake light *and* (2) suspicion of defendant's drug-related criminal activity. Blood's statement that he saw defendant at those two houses was the prompt from which defendant told Blood that she was at the Alpine Street house to return clothes. It is only after that statement that Blood decided that defendant was lying.

■ Having concluded that the officer unlawfully extended the duration of the traffic stop, we next consider whether the evidence that defendant seeks to suppress was nonetheless admissible because defendant consented to the search. In *Hall*, the Supreme Court stated that, once

"a defendant shows a minimal factual nexus between unlawful police conduct and the defendant's consent, then the state has the burden to prove that the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct. Deciding whether the state has satisfied that burden requires a fact-specific inquiry into the totality of the circumstances to determine the nature of the causal connection between the unlawful police conduct and the defendant's consent. A causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent. Although determining the existence of such a causal connection requires examination of the specific facts at issue in a particular case, we view several considerations to be relevant to that determination, including (1) the temporal proximity between the unlawful

police conduct and the defendant's consent, (2) the existence of any intervening circumstances, and (3) the presence of any circumstances * * * that mitigated the effect of the unlawful police conduct."

*Hall*, 339 Or at 34-35.

Here, defendant has shown a minimal factual nexus between the unlawful police conduct and defendant's consent to search. Thus, under *Hall*, the state has the burden to prove that defendant's consent was independent of or only tenuously related to the unlawful extension of the traffic stop.

The state has not met its burden. The officer asked for defendant's consent during the unlawful extension of the traffic stop. But for the unlawful extension of the traffic stop, the officer would not have decided that defendant was lying about the reason for her visit to the Alpine Street house, which prompted him to request consent to search defendant's car and defendant's person. Because the unlawful extension of the traffic stop and defendant's consent occurred in close temporal proximity, and because no intervening circumstances or mitigating factors exist, we agree with defendant that her consent derived from the officer's unlawful extension of the stop and that the evidence should therefore be suppressed.

In conclusion, the officer unlawfully prolonged an initially lawful traffic stop when he investigated defendant on a subject unrelated to the initial traffic infraction. Because the officer lacked reasonable suspicion to extend the stop, defendant's consent was the product of an unlawful seizure under Article I, section 9, and the evidence discovered as a result of that consent should have been suppressed. Accordingly, the trial court erred in denying defendant's motion to suppress evidence.

Reversed and remanded.