Argued and submitted November 27, 2012, reversed and remanded
November 6, 2013

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# MYLES RUSSEL PETERSON,
*Defendant-Appellant.*

Marion County Circuit Court
10C41311; A146017

313 P3d 388

Jedediah Peterson, Deputy Public Defender, argued the cause for appellant. With him on the opening brief was Peter Gartlan, Chief Defender, Office of Public Defense Services. Myles Russel Peterson filed the supplemental brief *pro se.*

Michael A. Casper, Deputy Solicitor General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and Haselton, Chief Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment of conviction on one count of delivery of heroin constituting a commercial drug offense, ORS 475.850 and ORS 475.900, and one count of possession of heroin, ORS 475.854. He asserts that the trial court erroneously denied his motion to suppress the evidence obtained from a search of his person and the statements that he made after an unlawfully extended traffic stop. We reverse and remand.[1]

We review the trial court's denial of a motion to suppress for errors of law. ORS 138.220. The trial court's findings of fact are binding on appeal if there is sufficient evidence in the record to support them. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). The following facts are taken from or are consistent with the trial court's findings.

Defendant was driving a Buick automobile when Officer Andrew Connolly saw him run a red light. Connolly activated his overhead lights, and defendant pulled into a parking lot. After defendant parked, Connolly blocked defendant's car into a parking space with his patrol car. Connolly asked for defendant's driver's license, insurance card, and registration. When defendant gave Connolly his license and insurance card,[2] Connolly recognized defendant from a previous encounter. During that encounter, defendant led police on a high speed chase, and police found ammunition and a knife in or near defendant's car. Connolly was also aware that defendant had been involved in another high speed chase, after which defendant had been subdued, and that defendant had a conviction for carrying a concealed weapon. Based on those safety concerns, Connolly called for backup. He also asked defendant if there were drugs, weapons, or anything illegal in the car. Defendant replied, "Not that I know of[.]"

---

[1] Defendant raises additional bases, arguments, and authorities for reversing the trial court's decision in a supplemental *pro se* brief. Because we reverse and remand on the basis that the officers conducted an unlawfully extended stop in contravention of Article I, section 9, of the Oregon Constitution, we do not discuss the other bases, arguments, and authorities.

[2] Defendant was unable to produce a registration certificate. Further, although Connolly did not realize it at the time, defendant's insurance card was for a different vehicle (an Acura).

A second officer arrived and "maintained on the car" with defendant. Connolly returned to his patrol car to write up a citation. After completing the citation, Connolly deactivated his lights, walked back to defendant's car, and returned defendant's documents. Connolly stood at the driver side window, facing the door. He gave defendant the citation and explained the court process. He told defendant that he was "free to go[.]"

Connolly then asked for consent to search defendant's car. Defendant did not consent. Instead, he asked why Connolly wanted to search his car, and Connolly replied that he had safety concerns based on their previous encounter. Defendant remarked that Connolly's patrol car was parked so close to his car that "he didn't feel that he could move." Connolly offered to move his patrol car. Defendant did not say whether "he wanted [Connolly] to move the car or not[.]" Defendant again asked why Connolly wanted to search his car. Connolly reiterated his safety concerns, asking for consent to search a second time. Defendant "never answered that question yes or no[.]"

Defendant then said that he ran the red light because he had been "looking in the rearview mirror at a fat lip." That remark "led to the defendant talking about having been in a fight" the night before. Connolly and defendant discussed whether defendant wanted to press charges against the person who injured him, but defendant said that he did not know if he wanted to press charges.

Seven to 10 minutes had elapsed since Connolly issued the citation. The second officer was still on the scene. While still standing at defendant's window talking with defendant, Connolly saw a for-sale sign for a 1998 Buick on defendant's rear floorboard. Connolly then remembered that the insurance card defendant had given him earlier was for an Acura, not for a Buick. Connolly asked defendant if the Buick was his, and defendant said that it was. Connolly then asked if defendant had insurance on the Buick. Defendant said that his parents took care of the insurance and that his mother had told him that the Buick was currently insured.

Connolly asked for the insurance card back, and defendant handed it over. Connolly said that he would have

to verify the insurance information before defendant would be allowed to leave. Connolly returned to his patrol car and called the insurance company. He was told that defendant's parents did, in fact, insure four cars, but that the Buick was not one of them. Connolly went back to defendant's car and told defendant that he was under arrest for knowingly giving an officer false information about liability insurance. ORS 806.055.[3] Incident to that arrest, Connolly searched defendant's pocket and found a Visine bottle containing heroin.

Before trial, defendant moved to suppress all statements made by him and all physical evidence seized from him. He contended, among other things, that he had been subjected to an unlawfully "expanded" traffic stop that violated his rights under Article I, section 9, of the Oregon Constitution.[4] Defendant did not argue that the initial stop was unlawful, but asserted that it became unlawful when Connolly, without reasonable suspicion, inquired into matters unrelated to the traffic infraction and prevented him from driving away. The state responded that defendant's motion should be denied because the stop was not unlawfully extended or, even if it was, the police did not exploit that illegality.

After a hearing, the trial court denied defendant's motion. The court found that Connolly's initial request to search was "well grounded[.]" It further found

"that the stop was terminated, that the defendant was free to leave, that he could have just indicated that he did want to leave and did not. Whether or not the burden is on him to do or the State to make that possible so he doesn't have to ask that question is a matter for appellate review."

In accordance with the trial court's ruling, the evidence was admitted at defendant's jury trial, and defendant was convicted.

---

[3] ORS 806.055(1) provides that "[a] person commits the offense of giving false information about liability insurance to a police officer if the person knowingly gives false information about the person's motor vehicle liability insurance coverage to any police officer who is enforcing motor vehicle laws."

[4] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Defendant appeals, renewing the arguments he made to the trial court. He does not assert that Connolly's initial question—whether there was anything illegal in the car—was unlawful. Rather, he contends that he was subjected to an unlawfully extended traffic stop when, after issuing a citation and telling defendant that he was free to go, Connolly made an unrelated request to search defendant's car. *See State v. Gant*, 237 Or App 74, 78, 239 P3d 269 (2010) (an officer unlawfully extends the scope of an otherwise lawful stop "if the officer questions the person about matters unrelated to the basis for the stop without reasonable suspicion of further criminal activity"). To support his argument, he cites *State v. Rodgers/Kirkeby*, 347 Or 610, 624, 227 P3d 695 (2010): "[P]olice inquiries unrelated to a traffic violation, when combined with physical restraint or a police show of authority, may result in a restriction of personal freedom that violates Article I, section 9." Defendant relies upon three cases for the proposition that a person can be restrained, even when an officer says that the person is free to leave: *State v. Toevs*, 327 Or 525, 964 P2d 1007 (1998); *State v. Dominguez-Martinez*, 321 Or 206, 895 P2d 306 (1995); and *State v. Alvarez*, 234 Or App 544, 228 P3d 683, *rev den*, 349 Or 57 (2010).

The state does not argue that Connolly's request to search was related to the traffic stop or justified by a reasonable suspicion of further criminal activity. Rather, the state responds that the stop was not unlawfully extended because defendant was free to leave but voluntarily chose to stay. It contends that Connolly twice told defendant that he could go—once by expressly stating that defendant was free to go, and once by offering to move his patrol car. The state further asserts that Connolly was not required to move his patrol car or take some other action to *prove* that he meant what he said. Rather, according to the state, Connolly's assurance that he would move his car was enough to show that defendant was truly at liberty to leave.

Thus, we are required to determine, under the totality of the circumstances, whether the police conduct "transgressed the limits of Article I, section 9, resulting in an unlawful seizure and, if so, whether the evidence * * * should be suppressed because it is a product of an unlawful

seizure." *Rodgers/Kirkeby*, 347 Or at 624. Although we are bound by the trial court's findings of fact to the extent that those findings are supported by evidence in the record, we review without deference whether the trial court correctly applied the law to those facts. *Id.* at 625.

As noted, Article I, section 9, precludes unreasonable seizures. "[A] traffic stop is a temporary seizure that occurs when an officer restrains a person's liberty or freedom of movement." *State v. Amaya*, 176 Or App 35, 43, 29 P3d 1177 (2001), *aff'd on other grounds*, 336 Or 616, 89 P3d 1163 (2004). While an officer may stop and briefly detain a motorist to investigate a noncriminal traffic violation, "[p]olice authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a citation (if any) is completed or reasonably should be completed." *Rodgers/Kirkeby*, 347 Or at 623. Accordingly, when a police officer has all of the information necessary to complete a traffic investigation but, instead of ending the encounter, "launch[es] an investigation into a matter that is unrelated to the infraction, [the officer has] unlawfully extended the stop." *State v. Alvarado*, 257 Or App 612, 627, 307 P3d 540 (2013).

For example, in *Dominguez-Martinez*, a trooper stopped the defendant and his passenger for a traffic infraction. The trooper leaned his arm on the passenger's door, said that he would not issue a citation, and told the men that they were free to go. Almost immediately, however, without removing his arm, the trooper asked if the men were transporting contraband and asked to search the car. The court concluded that that trooper's questioning subjected the defendant to a continued detention. *Dominguez-Martinez*, 321 Or at 213. In conducting its analysis, the court remarked, "[A]t the same time that the trooper was telling [the men] that they were free to go, he stood in the open doorway, and defendant could not have driven away." *Id.*

This case is significantly similar to *Dominguez-Martinez*. By asking defendant for consent to search after issuing a citation, Connolly began a line of questioning that was unrelated to the traffic stop and unsupported by

a reasonable suspicion of criminal activity. Further, during that unlawful questioning, the police restricted defendant's freedom of movement. Connolly stood at defendant's window, looking into defendant's car. A second officer was present on the scene. Although the record does not indicate precisely where the second officer stood, the presence of a second officer is "a relevant consideration when determining whether there was a show of police authority that restrained defendant's liberty." *State v. Courtney*, 242 Or App 321, 333, 255 P3d 577, *rev den*, 351 Or 401 (2011). Finally, and most importantly, Connolly physically blocked defendant with his patrol car, such that defendant could not leave. *See State v. Mesenbrink*, 106 Or App 306, 309, 807 P2d 319, *rev den*, 312 Or 235 (1991) (a stop occurs "when an officer's vehicle blocks a vehicle in a manner that would prevent it from being driven away"). The following interchange between defense counsel and Connolly is instructive:

"Q   *** [Y]ou told him he was free to go, but he wasn't actually able to leave at that point, was he?

"A   If [defendant] had asked me to move my patrol car at that point, I would have moved my patrol car and he would have been on his way.

"Q   But without asking you, he couldn't have left; isn't that right?

"A   No. Well, it depends what time frame you're talking about.

"Q   His car was blocked in; is that right?

"A   At that point, yes.

"Q   Did it stop being blocked in at some point in time?

"A   No."

Like the defendant in *Dominguez-Martinez*, defendant here could not have driven away. In fact, the physical restraint involved in this case is even more pronounced than in *Dominguez-Martinez*; while the trooper there restricted the defendant's movement with his body, the officer here prevented defendant's progress with his patrol car.

In arguing that the stop had ended, the state deemphasizes the fact that defendant was physically blocked and

emphasizes Connolly's and defendant's verbal exchanges. In particular, the state stresses that Connolly offered to move his patrol car and did nothing bullying or intimidating to suggest that his offer was not genuine. But the state overlooks the principle that an officer's conduct may negate an officer's assurance that a stop has ended. As the Oregon Supreme Court explained in *Toevs*,

> "when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed had ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's *conduct* after stating that a driver is free to go may *negate* such a statement."

327 Or at 537 (emphasis in original). Although Connolly offered to move his patrol car, he never actually moved it; instead, he continued to question defendant while defendant was still restrained.

The state finally argues that, when Connolly offered to move his patrol car, "[d]efendant did not ask Connolly to move his car." We reject that argument because the obligation to unambiguously end traffic stops does not fall on citizens; it falls on law enforcement officials. *See State v. Primeaux*, 230 Or App 470, 476, 216 P3d 887 (2009), *rev den*, 349 Or 664 (2011) (state has the burden to prove that the original traffic stop had ended).

Thus, under the totality of the circumstances, we conclude that the continued interrogation of defendant was not justified by reasonable suspicion of criminal activity, was unrelated to the traffic infraction, and significantly restricted defendant's freedom of movement. By their conduct, the officers continued to detain defendant in an extended traffic stop, and defendant was unlawfully seized under Article I, section 9.

Having concluded that defendant was subjected to an unlawfully extended stop, we now consider whether the challenged evidence should be suppressed. When a defendant seeks to suppress evidence based on a constitutional violation, the defendant must establish a "minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed

and prior unlawful police conduct[.]" *State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005) (citing *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003)). "[M]erely showing that one thing occurred after another—*i.e.*, a factual relationship based *only* on temporal proximity—does not satisfy the minimal factual nexus standard." *Courtney*, 242 Or App at 227. However, when police discover evidence as the result of unlawful investigatory actions, "it is logical to conclude that * * * the evidence would not have been discovered 'but for' the unlawful police conduct." *Id.*

As noted, defendant seeks to suppress all statements made by him and physical evidence seized from him, contending that that evidence would not have been discovered "but for" the unlawful extension. He relies upon *State v. Ayles*, 348 Or 622, 631-32, 237 P3d 805 (2010), where the court found a "but for" connection between an unlawful stop involving the retention of the defendant's identification and a search based on the defendant's consent because the unlawful police conduct made the defendant available for questioning. Defendant contends that the *Ayles* reasoning applies in this case—"but for" the unlawfully extended stop, the police would not have been in the position to ask him questions about his insurance, would not have been able to invoke the search incident to arrest exception to search his person, and would not have discovered the heroin in his pocket. The state responds that there is no factual nexus between the illegality and the discovery of the evidence. It contends that subsequent intervening circumstances—Connolly's offer to move his patrol car, defendant's decision to stay, and defendant's lawful arrest—broke the causal chain. *See Hall*, 339 Or at 35 (listing "the existence of any intervening circumstances" as a factor to be considered when determining the existence of a causal connection).

We conclude that defendant has established the required factual nexus. Like the defendant in *Ayles*, defendant was not free to leave, and the illegal police conduct made defendant's car available for additional scrutiny and defendant available for questioning. Because that scrutiny and questioning directly yielded evidence that led to defendant's arrest, we conclude that the statements and heroin would not have been discovered "but for" the unlawful police conduct.

After a defendant establishes the existence of a minimal factual nexus between the challenged evidence and unlawful police conduct, the state may seek to establish that that evidence is nonetheless admissible by showing that it did not derive from—"or, stated differently, was [not] obtained by 'exploitation' of—the unlawful stop." *Hall*, 339 Or at 22. To make that showing, the state must prove that the disputed evidence (1) would have been inevitably discovered; (2) was independently obtained; or (3) was sufficiently attenuated from the unlawful police conduct. *Id.* at 25. Determining whether the state has met its burden involves a fact-specific inquiry into the totality of the circumstances. *Id.* at 35.

The state contends that the evidence in this case did not derive from the preceding illegality. The state first argues that the evidence was independently obtained because Connolly developed probable cause for the arrest on his own, as if a "light bulb just went on in [his] head." The trial court's findings confirm that Connolly did not *independently* develop probable cause. According to the trial court, "The officer then noticed the for-sale sign, then put two and two together in terms of * * * the insurance card the defendant had given him which recited to an Acura, not a Buick, and at least at that point had suspicion that there was a crime." We are bound by that finding. Because Connolly "put two and two together" immediately after he saw the sign, the state cannot show that the sign did not prompt the suspicion, which served as the basis for Connolly's probable cause. Thus, the arrest was not caused completely by circumstances that were unrelated to the unlawful extension of defendant's detention.

The state alternatively contends that the unlawful extension is sufficiently attenuated from defendant's arrest. We disagree. *State v. Broughton*, 221 Or App 580, 193 P3d 978 (2008), *rev dismissed*, 348 Or 415 (2010), is instructive. In *Broughton*, what began as a lawful stop based on a traffic infraction became unlawful when the officer detained the defendant by telling her that he had just seen her leave a known drug house. In response, the defendant told the officer that she had been at the house to return some clothes. After the defendant made that statement, the officer decided

that the defendant was lying because he had seen her go into the house with nothing in her hands. The officer's suspicion that the defendant was lying then prompted the officer to request consent to search the defendant's car and person. The defendant consented and drug evidence was found. In determining that that evidence should have been suppressed, this court stated:

> "But for the unlawful extension of the traffic stop, the officer would not have decided that defendant was lying about the reason for her visit to the Alpine Street house, which prompted him to request consent to search defendant's car and defendant's person. Because the unlawful extension of the traffic stop and defendant's consent occurred in close temporal proximity, and because no intervening circumstances or mitigating factors exist, we agree with defendant that her consent derived from the officer's unlawful extension of the stop and that the evidence should therefore be suppressed."

*Id.* at 592.

This case is much like *Broughton*. But for the unlawful extension, Connolly would not have seen the sign, which led him to believe that there was something wrong with defendant's insurance. Connolly's suspicion then prompted him to ask defendant questions about his insurance and to demand the return of defendant's insurance card. In the same way that the defendant in *Broughton* consented to being searched in response to the officer's request, defendant here made statements about his insurance in response to Connolly's questioning, not on his own initiative. Further, defendant made the challenged statements only seven to 10 minutes after Connolly began the unlawfully extended stop, so those events occurred in close temporal proximity.

In the end, we conclude that Connolly's request to search defendant's car and the unlawful extension of defendant's detention started a chain of events that led directly to defendant's arrest and discovery of the evidence. If Connolly had not unlawfully asked defendant for consent to search his car, he would not have been looking into defendant's car, would not have seen the for-sale sign, would not have become suspicious about defendant's insurance, and would not have asked the questions that elicited defendant's response and

led to defendant's arrest. Therefore, the discovery of the evidence incident to that arrest is not attenuated from the illegal police conduct. Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.