Argued and submitted August 27, 2009, reversed and remanded March 31, 2010

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## DANIEL LEBARON ALVAREZ,
*Defendant-Appellant.*

Lincoln County Circuit Court
061534, 061892;
A137300 (Control), A137301

228 P3d 683

Marc D. Brown, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Anna Marie Joyce, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Erika L. Hadlock, Acting Solicitor General, and Greg Rios, Assistant Attorney General.

Before Schuman, Presiding Judge, and Brewer, Chief Judge, and Riggs, Senior Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant appeals his conviction for possession of a controlled substance, assigning error to the trial court's denial of his motion to suppress evidence obtained after he consented to a search of his vehicle. Specifically, he argues that, although the evidence was discovered after he consented to the search, his consent was obtained either during the unlawful extension of what began as a lawful stop or, if the lawful stop had ended, during a subsequent stop that was not lawful. We agree and reverse and remand.

The following facts are not in dispute on appeal. Oregon State Police Trooper Boyd, driving a marked police car, noticed defendant driving a car without front or rear license plates, a traffic violation. Boyd, who was in uniform, stopped defendant's car, approached him, explained the reason for the traffic stop, and asked defendant about the missing plates. Defendant responded that he was unaware that his plates were missing. Boyd then asked defendant for his license, registration, and insurance information, which defendant provided. Boyd returned to his car and ran defendant's information through dispatch. While Boyd was in the process of running the check on defendant's information, Oregon State Police Trooper McGladrey, also in a marked car and wearing a uniform, arrived to assist him.

The check came back clear. Boyd walked back to defendant's car, returned defendant's documents, gave defendant a warning for not having license plates, told defendant that he was "free to leave," and stepped back from the vehicle. At that point, the "forward-facing red and blue lights" on Boyd's police car had been turned off and nothing "block[ed] [defendant's] pathway or his ability to leave the scene."

"[A] few seconds" after telling defendant that he was free to go, Boyd asked defendant, in a "relaxed" manner, for his consent to search the car and if he "[had] anything with you that [Boyd] need[ed] to know about." Defendant asked why a search was necessary. McGladrey, who had been watching Boyd and defendant from his position behind defendant's car, then approached the driver's side and "[took] over the discussion," while Boyd "stepped back" but remained on

the scene behind defendant's car. In a "calm and professional" manner, McGladrey answered defendant's question by telling him that there was "a high incidence of * * * drug use and trafficking in [the] area." He then

"pointed out the fact that there were no license plates on the vehicle. Uh, it was, it was night. It was dark outside. Um, it was basically suspicious activity. And I asked [defendant] if he could understand that from our perspective, from our position. That, uh, we're a little concerned about, uh, his activity that night. And I asked if he'd be willing to let us search the vehicle for those reasons[.]"

Defendant consented. Boyd searched the car and discovered a glass pipe with a "considerable amount of residue inside it" on the front driver's side floorboard. Subsequent laboratory tests revealed that the residue was methamphetamine.

Defendant was charged with possession of a controlled substance. *Former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005). Before trial, he moved to suppress the evidence found in his car on the ground that, in violation of Article I, section 9, of the Oregon Constitution, the officers had "unlawfully expanded the scope of the traffic stop by asking defendant for consent to search the vehicle without reasonable suspicion that defendant had engaged in any criminal activity." He also argued that, "once a traffic stop is over, at that point the officer must have reasonable suspicion to continue to ask questions and to ask for consent to search." Further, he testified that he "didn't feel like [he] was free to leave" after Boyd returned his documentation "[b]ecause [Boyd] was * * * standing pretty close to the vehicle" and that he ultimately consented because he "felt like [he] wouldn't be able to leave" if he did not. Both officers testified that they did not believe that the situation presented a safety risk and that they did not have reasonable suspicion of criminal activity beyond the traffic violation. The trial court denied the motion without making any findings of fact that are relevant on appeal.

On appeal, defendant concedes that his encounter with the police began as a lawful stop based on a traffic infraction, but argues, among other things, that Boyd concluded that lawful stop and initiated a second, unlawful stop

when, without reasonable suspicion, he questioned defendant about unrelated matters and asked for defendant's consent to search. The state contends, in response, that the traffic stop ended when Boyd told defendant that he was free to leave and stepped away from the vehicle and that Boyd's and McGladrey's contacts with defendant after that point "never moved beyond a 'mere conversation.' "

 Article I, section 9, of the Oregon Constitution precludes unreasonable searches and seizures.[1] A seizure occurs when "a person *subjectively* believes that a law enforcement officer significantly has restricted or interfered with that person's liberty or freedom of movement *and* such belief is *objectively reasonable* under the circumstances." *State v. Toevs,* 327 Or 525, 535, 964 P2d 1007 (1998) (citing *State v. Holmes,* 311 Or 400, 409-10, 813 P2d 28 (1991)) (emphasis in original). A stop is a temporary seizure. *Id.* at 534. To be reasonable, stops must be supported by reasonable suspicion of criminal activity. *Id.* A "mere conversation" or other "noncoercive encounter," however, involves no restraint on liberty and, therefore, requires no justification. In determining whether a stop has occurred, the central inquiry is whether an officer

> "engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as nonoffensive contact if it had occurred between two ordinary citizens."

*Holmes,* 311 Or at 410. The determination requires a fact-specific inquiry into the totality of the circumstances. *Toevs,* 327 Or at 535.

The circumstances here might be analyzed in either of two ways. First, we might consider the entire interaction as a single police-citizen encounter, in which case the dispositive question is whether the officers' request for consent, without reasonable suspicion of additional criminal activity, amounted to a stop of defendant by detaining him beyond the

---

[1] Article I, section 9, of the Oregon Constitution provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

time necessary to complete the citation or decide that no citation was warranted. *E.g., State v. Ehret (A111248)*, 184 Or App 1, 55 P3d 512 (2002). Second, we might treat the interaction as two encounters, the first of which was a traffic stop that ended when Boyd returned defendant's documents and told him he was free to leave, and the second of which began when Boyd asked for consent to search defendant's car. In that case, the dispositive question is whether the second encounter was a stop. Because it is undisputed that the officers did not have reasonable suspicion of illegal activity beyond the traffic violation at the time that defendant gave consent, the inquiry in either case is the same: Did the officers stop defendant before they had reasonable suspicion of criminal activity? If this is an *Ehret* case, and the answer is yes, then the officer's conduct unlawfully extended the stop. If this is a *Toevs* case, and the answer is yes, then the officer's conduct unlawfully initiated a second stop. Thus, applying the definition of a "stop" from *Holmes*, the question is: Was defendant's belief that he was not free to leave when he consented to the search objectively reasonable?

In *Toevs*, the defendant was lawfully stopped for a traffic infraction. After checking the defendant's information, the officer returned the defendant's documents, told the defendant that he was free to go, and then immediately asked for consent to search his truck. The defendant refused and asked the officer if he was being accused of anything; the officer responded that he was not, but wondered why he would not consent. The officer asked again if he could search the vehicle and whether it contained any drugs. The defendant responded that he did not have any drugs and again refused to consent. At that point, the back-up officer, who had been watching the defendant and the officer from his position behind the defendant's truck, approached the driver's side, and interrupted their conversation. The back-up officer asked the defendant, in a low-key manner if he had any drugs in the vehicle. The defendant responded that he did not. The back-up officer then told the defendant that the defendant would feel better if he were honest and admitted to having drugs in the vehicle, if he had them, and asked again if he had any drugs. This time, the defendant responded, " '[t]here is a little in the truck.' " *Toevs*, 327 Or at 529. The

officers ordered the defendant from the vehicle, searched it, and found the methamphetamine that led to the defendant's conviction. *Id.*

The Supreme Court held that, under the totality of the circumstances,

> "a reasonable person in defendant's position could have believed that the officers significantly had restricted his liberty or freedom of movement. Indeed, the officers' continuous show of police authority constituted conduct that was 'significantly beyond that accepted in ordinary social intercourse.' *Holmes*, 311 Or at 410. Therefore, through that conduct, they continued to detain defendant. * * *

> "It is true that, when an officer tells a driver that he or she is free to go, that factor certainly can weigh in favor of concluding that a traffic stop indeed has ended. However, our case law demonstrates that, when viewing the totality of the circumstances, an officer's *conduct* after stating that a driver is free to go may *negate* such a statement. * * *

> "In sum, we conclude that the stop did not end when [the officer] returned [the] defendant's documents and told him that he was free to go. * * *"

*Id.* at 536-37 (emphasis in original). And because the officers' continued questioning amounted to further detention not reasonably related to the traffic infraction and not independently justified by further reasonable suspicion of criminal activity, the court required that the evidence be suppressed.[2] *Id.* at 532.

■ The factual scenario in this case is not materially different from the one in *Toevs*. Here, as in *Toevs*, defendant was lawfully stopped for a traffic infraction and, as in *Toevs*, the officer returned defendant's documents, told defendant that he was free to go, and then immediately asked for consent to search defendant's vehicle. And, just as the back-up officer in *Toevs* interrupted the conversation between the first officer and the defendant and pressured the defendant in that case to consent, here, McGladrey, the back-up officer,

---

[2] Although *Toevs* involved a determination whether the officers' contact with the defendant rose to the level of a stop or detention under the criminal procedure code rather than under Article I, section 9, the Supreme Court has noted that the analysis under either authority is "substantially the same." *Toevs*, 327 Or at 534.

"[took] over" the discussion between defendant and Boyd, informed defendant that he appeared "suspicious," explained that defendant was in a high crime area at night, and asked a second time for defendant's consent. That "continuous show of police authority," *id.* at 536-37, constitutes conduct "significantly beyond that accepted in ordinary social intercourse," *Holmes*, 311 Or at 410, and served to "negate" Boyd's statement that defendant was free to go. Moreover, nothing in *Toevs* indicates that the defendant's path was blocked in that case, and the court did not consider that fact in its analysis. Further, as in *Toevs*, the encounter occurred after a traffic stop and, as the Supreme Court has recently explained, in such situations, a person's belief that he or she is not free to leave the scene is inherently more reasonable than it is in other types of citizen-police encounters. *State v. Rodgers / Kirkeby*, 347 Or 610, 623, 227 P3d 695 (2010). Thus, we conclude that defendant was stopped, for purposes of Article I, section 9, when the officers asked for his consent.

We turn lastly to defendant's contention that his consent to search was a product of the unlawful seizure and that all evidence discovered as a result must be suppressed. As noted above, the trial court concluded that "consent was free and voluntary." But the Supreme Court

> "repeatedly has recognized that, even when a defendant's consent is voluntary—that is, when the defendant's free will has not been overcome by police coercion—that consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9."

*State v. Hall*, 339 Or 7, 27, 115 P3d 908 (2005).

In *Hall*, the Supreme Court held that "evidence [obtained] from a search following an otherwise valid consent is subject to suppression under the Oregon exclusionary rule if the defendant's consent is the product of preceding unlawful police conduct." *Id.* at 36. The court explained that, after the defendant has established a minimum factual nexus— that is, the existence of a "but for" relationship between the disputed evidence and the prior illegality—the state has the

burden to demonstrate that "the defendant's consent was independent of, or only tenuously related to, the unlawful police conduct." *Id.* at 25, 34-35. Accordingly, the court held that the state had not met its burden in that case, given the close temporal proximity between the unlawful detention and the defendant's consent to search and the absence of any intervening or mitigating circumstances; thus the disputed evidence was suppressed. *Id.* at 36.

■ Defendant in this case has shown the requisite "but for" connection: the officers asked for defendant's consent during the unlawful extension of the traffic stop (or, alternatively, during an unlawful second stop); thus, but for that unlawful seizure, neither officer would have been in a position to request consent. Because the unlawful seizure and defendant's consent occurred contemporaneously, and because no intervening or mitigating factors exist, we agree with defendant that his consent derived from the officers' unlawful seizure and that the evidence should have been suppressed.

Reversed and remanded.