2015 COA 77

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Mark WEEKS, Defendant–Appellant.**

**Court of Appeals No. 12CA0481**

Colorado Court of Appeals, Division III.

Announced June 18, 2015

Cynthia H. Coffman, Attorney General, Jay C. Fisher, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Walta, LLC, Mark G. Walta, Denver, Colorado, for Defendant–Appellant

Opinion by JUDGE DAILEY

¶ 1 Defendant, Mark Weeks, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree murder (causing the death of a child under the age of twelve by one in position of trust) and child abuse (knowing or reckless conduct, resulting in death). We affirm.

*I. Background*

¶ 2 Defendant's convictions arose out of the death of his three-year-old daughter, A.M. Defendant lived in a trailer home with his wife, G.W., who was not A.M.'s mother but who had raised A.M. from birth.

¶ 3 One morning, defendant and G.W. discovered that A.M., who was potty-trained but had been regressing for a few weeks, had urinated in her bed. Defendant took A.M. outside naked to wash her off under a cold-water spigot. He sat her down on the floor of the trailer, told her to lie there, and went to a convenience store to buy some cigarettes.

¶ 4 G.W. spanked A.M. while defendant was gone. Varying accounts exist of what happened when he returned. Initially, both G.W. and defendant said that A.M., angry about being put in a time out, had "flopped" backwards and hit her head on the stove. Later, however, G.W. said that defendant had picked A.M. up by her biceps, yelled at her about where she was supposed to go to the bathroom, shook her, and "slammed"[1] her head into the plywood wall of the trailer. It was only after defendant put her down on the floor that A.M. fell backward and hit her head on the stove. (G.W. testified similarly to this latter account at trial, saying then, however, that she did not think defendant pushed A.M. against the wall very hard.)

¶ 5 At some point, A.M. became unresponsive, and defendant and G.W. dressed her and drove her to the hospital. Medical personnel determined that A.M. had suffered a skull fracture and a subdural hematoma. Additionally, her left eye had also been "blown out" of her skull, causing retinal hemorrhaging. Although she was airlifted to Denver for treatment, A.M. was declared brain dead the next day and taken off life support. The autopsy revealed that she also had bruised lungs, a healing rib fracture, and extensive bruising all over her body. The pathologist who conducted the autopsy concluded that A.M.'s injuries were "not consistent with accidental trauma."

¶ 6 A grand jury indicted defendant and G.W. on charges of first degree murder (causing the death of a child under the age of twelve by one in position of trust) and child abuse resulting in death (knowing or reckless conduct). In exchange for her testimony against defendant, however, G.W. was given immunity from prosecution for the allegedly false statements she made before the grand jury and allowed to plead guilty to a single, lesser charge of child abuse resulting in death (criminally negligent conduct), for which she was sentenced to a term of twelve years imprisonment in the custody of the Department of Corrections.

---

1. G.W. made this statement during a videotaped interview she gave in response to an offered plea bargain. She demonstrated defendant's action twice during the interview, once by slamming both hands against the wall, and once by slapping the prosecutor's notebook into the wall with considerable force. She added that defendant's "slamming" action made a loud noise.

The videotaped interview was admitted at trial.

¶ 7 During opening statements, defense counsel said that the evidence would show that G.W. had caused A.M.'s head injuries or that they were possibly the result of an accidental fall.

¶ 8 On the question of who was responsible for injuring A.M., the prosecution presented, in addition to G.W.'s testimony, evidence that defendant had

- strictly disciplined A.M. and G.W.'s two daughters from a prior relationship, N.B. and K.B., who were eleven and eight years old, respectively, at the time of trial (N.B. and K.B. lived with their father but would visit defendant and G.W.);

- callously mistreated A.M. in the past;[2]

- previously become verbally and sometimes physically abusive to N.B., K.B., the family cats, and a puppy, after they had urinated or vomited in defendant's home;

- exchanged text messages with G.W. about their frustration with A.M.'s potty training regression as well as about an injury to her eye. At one point, G.W. texted, "I told mom and dad that [A.M.] went to the bathroom and you got up to flush the toilet and we didn't see her and your knee got in her eye." Defendant responded, "Okay. I'm done with her though. She's on her own," which prompted G.W. to remind defendant that A.M. was only three years old;

- attempted to conceal his misconduct in connection with A.M.'s injuries;[3] and,

- not displayed any emotion at the hospital,[4] not wanted to kiss A.M. goodbye before she was airlifted to Denver, and only been concerned about getting his iPhone back from police while signing forms to donate A.M.'s organs.

¶ 9 On whether A.M.'s head injury was caused by her "flopping" into the stove, the prosecution presented the testimony of several medical experts, all of whom agreed that A.M.'s head injury required great force and was caused by nonaccidental trauma. All but one of the experts agreed her injury could not have been caused by A.M.'s "flopping" into the stove. One expert also said she would diagnose A.M. with physical child abuse and said that A.M.'s bruising was "some of the worst ... [she had] ever seen."

¶ 10 Defendant did not testify. Defense counsel called only one witness, a defense investigator who testified that the trailer's plywood wall, which was only one-eighth of an inch thick, did not have any signs of damage or any of A.M.'s skin or hair on it.

¶ 11 In closing argument, defense counsel largely abandoned his theory that G.W. caused A.M.'s injuries. He asserted, instead, that although the evidence indicated that A.M.'s injuries were not the result of an accident, it was unclear from that evidence who had inflicted the injuries, but it was not defendant.

¶ 12 The jury convicted defendant as charged, and the trial court sentenced him on the first degree murder count to a controlling term of life imprisonment without the possibility of parole in the custody of the Department of Corrections.

## II. Evidence of Other Acts

¶ 13 Defendant contends that reversal is required because the trial court erroneously admitted evidence of other acts involving N.B., K.B., and family pets. We disagree.

¶ 14 The trial court allowed the prosecution to introduce evidence that defendant had

- forced N.B. to sit in the living room and angrily yelled for ten minutes at her for

2. Others observed (1) defendant shake, push, and angrily yell at A.M.; (2) bruises on A.M., including a handprint-shaped bruise on her face for which a relative confronted defendant; and (3) A.M.'s mood change, and her not wanting to leave with defendant when he came to get her from her stepgrandparents' house on more than one occasion. In addition, in his videotaped interviews with police, defendant admitted that he had used the cold-water spigot to punish A.M. to make her "suffer" and get "the shakes."

3. Defendant was overheard on the phone, while in A.M.'s hospital room, saying, "We're going to be okay. We've got our stories straight. She fell off the roof.... She might have some handprints or marks on her body; but I told them that it [sic] might have just grabbed her too hard."

4. There was conflicting evidence in this regard at trial.

vomiting in the middle of the night and waking him up to assist her;

- on multiple occasions put K.B. in time out when she would urinate in her pants, refused to help her change, and told her father that he was "too easy on her" when she had wet the bed or needed to urinate during the night;

- disciplined the family's pet cats when they had urinated in the house by grabbing them by their throats and holding them up against the wall; and

- slammed a puppy's head against a wall to punish it for urinating on the floor, prompting his ex-wife to give the puppy away out of fear for its safety.

The trial court instructed the jury, on each occasion when the particular evidence was admitted and again at the end of trial, that

- the evidence of the incidents with N.B., K.B., and the cats was admitted only for the purposes of showing intent, knowledge, and absence of mistake or accident; and,

- the evidence of the incident with the puppy was admitted only for the purpose of showing an absence of mistake or accident.[5]

¶ 15 CRE 404(b) governs the admission of evidence of other acts. Under that rule, evidence of other acts is inadmissible if its relevance depends *only* on an inference that the person has a bad character and acted in conformity therewith. *People v. Pollard*, 2013 COA 31M, ¶ 11, 307 P.3d 1124. Other act evidence is admissible if "[1] it is logically relevant for some reason apart from an inference that the defendant acted in conformity with a character trait, and [2] the probative value of the evidence for that other reason is not substantially outweighed by the other policy considerations of [CRE] 403." *People v. Rath*, 44 P.3d 1033, 1038 (Colo.2002).[6]

¶ 16 A trial court has considerable discretion in determining whether evidence has logical relevance in tending to prove a material fact and also in balancing its probative value against its potential for unfair prejudice. *People v. Orozco*, 210 P.3d 472, 477 (Colo.App.2009). On appeal of a trial court's ruling admitting other act evidence, we accord the evidence the maximum probative value attributable to it by a reasonable fact finder and the minimum unfair prejudice to be reasonably expected; we will uphold the trial court's ruling unless it was manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 17 Defendant argues, as he did before the trial court, that this evidence was irrelevant to the case other than to show his propensity for anger, and that its unfair prejudice outweighed any probative value.

¶ 18 Initially, we note that use of other act evidence to show intent, knowledge, and absence of mistake or accident qualifies as a "proper" purpose independent of the inference that a defendant acted in conformity with a character trait. *See* CRE 404(b) (including these as permissible purposes of other act evidence).

¶ 19 The issue, then, is whether the evidence was logically relevant to show intent, knowledge, or absence or mistake or accident, and, if so, whether the trial court was nonetheless compelled to exclude the evidence under CRE 403 as unfairly prejudicial.

¶ 20 Evidence is logically relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

¶ 21 Contrary to the trial court's determination, the evidence of the incidents involving N.B., K.B., and the cats was not relevant to show defendant's mental state vis-a-vis his acts with A.M.

■ ¶ 22 "[W]here, as here, other act evidence is offered to prove a mental state, 'the prior conduct [must involve] the *same intent*

---

**5.** The trial court had determined that the evidence involving K.B., the cats, and the puppy was also relevant to show defendant's motive for slamming A.M. against the wall. The court did not, however, instruct the jury that it could consider the evidence for that purpose.

**6.** This two-part test is a reformulation of the traditional four-part test first articulated in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo.1990). The first part of the reformulated test encompasses the first three parts of the *Spoto* test. *See People v. Rath*, 44 P.3d 1033, 1038 (Colo.2002).

that the prosecution seeks to establish in the charged offense.'" *People v. Casias,* 2012. COA 117, ¶ 42, 312 P.3d 208 (quoting *People v. Spoto,* 772 P.2d 631, 633 (Colo.App.1988), *aff'd,* 795 P.2d 1314 (Colo.1990)).

¶ 23 In this case, as in *Casias,* the prosecutor had to prove that defendant (1) engaged in conduct which he was aware was practically certain to cause A.M.'s death (the relevant standard for first degree murder) and (2) was either aware (for knowing child abuse) or consciously disregarded a substantial and unjustifiable risk (for reckless child abuse) that his conduct could result in serious bodily injury or death to A.M. *See Casias,* ¶¶ 33–35. The division in *Casias* concluded that, where the prosecution seeks to introduce evidence of a defendant's prior abuse of one child to show the defendant's knowledge or recklessness in causing the death of another child, the acts of prior abuse are not probative of a defendant's mental state unless they, resulted in serious bodily injury or death. *See id.* at ¶¶ 43–50.

■ ¶ 24 Consistent with the decision in *Casias,* we conclude that, because no evidence was presented that K.B., N.B., or the cats suffered injury or death as a result of defendant's prior acts, the evidence involving them was not relevant to establishing his intent or knowledge during the incident with A.M.

■ ¶ 25 However, the evidence of defendant's other acts vis-a-vis K.B., the cats, and the puppy was relevant, independent of any impermissible inference of bad character, to show that A.M.'s death resulted not from accidental contact with the stove, but from an act committed by defendant.

¶ 26 When a defendant asserts that a victim was injured accidentally (as defendant did here, in his statements to the police), prior similar acts may be relevant to rebut this argument and show that the defendant caused the injury. *See People v. Fry,* 74 P.3d 360, 370–71 (Colo.App.2002); *see also People v. Christian,* 632 P.2d 1031, 1036–37 (Colo.1981).

¶ 27 Indeed, "[t]here is broad consensus that similar acts evidence may be introduced on a doctrine of chances rationale to prove

the defendant committed an actus reus when the defendant asserts that he did not cause the social harm.... This type of evidence is admitted under several of the familiar category labels—absence of mistake or accident, modus operandi, or plan or scheme—but probability based reasoning underlies its relevance." Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape:* People v. Ewoldt *Reconsidered,* 29 U.C. Davis L.Rev. 355, 386 (1996); *see also Casias,* ¶ 51 (evidence of prior similar acts is admissible to disprove a claim of accident under the doctrine of chances).

·¶ 28 In *People v. Spoto,* 795 P.2d 1314 (Colo.1990), the supreme court provided the following illustration of how the doctrine of chances works:

> "[S]uppose that the defendant is charged with murdering his wife. The wife was found dead in her bath tub. The defendant claims that she accidentally drowned while bathing. In this situation, there is both English and American case law admitting evidence of similar deaths of the defendant's previous wives. The courts reason that the credibility of the accident theory decreases as the number of similar incidents increases. The intermediate inference ... is objective or statistical unlikelihood under the doctrine of chances rather than the defendant's subjective character."

*Id.* at 1319 (quoting Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 4:01 (1984)); *see People v. Everett,* 250 P.3d 649, 657 (Colo.App.2010) ("[T]he use of the doctrine of chances creates reasoning that is independent of the intermediate inference of the defendant's bad character: the evidence of other acts leads to the intermediate inference that it is objectively improbable that the accused would be involved in multiple unusual events, which, in turn, leads to the ultimate inference that *the accused committed the actus reus* of the charged crime." (emphasis added)).

■ ¶ 29 To admit other act evidence pursuant to the doctrine of chances to prove the actus reus (or defendant's identity as the

perpetrator of the offense [7]), three conditions must be satisfied: (1) the evidence of other acts must be roughly similar to the charged crime; (2) the number of unusual occurrences in which the defendant has been involved must exceed the frequency rate for the general population; and (3) there must be a real dispute between the prosecution and the defense over whether the actus reus occurred. *See Everett*, 250 P.3d at 658.

¶ 30 Those conditions are satisfied with respect to the evidence involving K.B., the cats, and the puppy. In each instance, defendant lost his temper and became verbally and sometimes physically abusive when the child or pets urinated in the house. His acts in putting or slamming the animals against the wall were, in particular, strikingly similar to the alleged incident involving A.M. In our view, the incidents were sufficiently similar and numerous to be probative of an issue that was in dispute, that is, whether A.M. was injured in a fall against the stove or as a result of being slammed against the wall by defendant. Thus, the other act evidence involving K.B., the cats, and the puppy tended to prove that A.M.'s injuries were caused by defendant's acts rather than by an accident. *See Fry*, 74 P.3d at 370–71 (evidence of other violent outbursts toward other women relevant to show that the defendant hit the victim and that she did not sustain her injuries from an accidental fall); *cf. Christian*, 632 P.2d at 1036–37 (evidence of other, similar child abuse incidents was admissible to prove that the defendant injured his daughter and that her injuries were not attributable to a "near automobile collision" or "her falling or thrashing about in her crib").

¶ 31 Defendant asserts, however, that the evidence involving the cats and puppy were not probative of any material fact because they involved animals rather than children. We are not persuaded.

¶ 32 Several commentators have noted a link between animal abuse and child abuse. *See* Susan Crowell, Note, *Animal Cruelty As It Relates to Child Abuse: Shedding Light on A 'Hidden' Problem*, 20 J. Juv. L. 38, 50 (1999) ("The reasons people abuse children are very similar to the reasons people abuse animals. . . . It is important to realize that whether abuse is targeted at an animal or a person, the issue is the same: power and preying on the vulnerable. The choice of the victim is opportunistic." (internal quotation marks omitted)); Naseem Stecker, *Domestic Violence and the Animal Cruelty Connection*, 83 Mich. B.J. 36 (Sept.2004) (noting that there have been "three decades of studies on the human-animal connection that show[ ] the clear link between animal cruelty, domestic violence, child abuse, and other criminal activity"); Melissa Trollinger, *The Link Among Animal Abuse, Child Abuse, and Domestic Violence*, 30 Colo. Law. 29 (Sept.2001) ("Although the research is fairly new, several studies have documented a link among animal abuse, domestic violence, and child abuse.").

¶ 33 At least one commentator has suggested that because of this link, evidence of animal abuse should usually be admissible in child abuse cases. *See* Angela Campbell, Note, *The Admissibility of Evidence of Animal Abuse in Criminal Trials for Child and Domestic Abuse*, 43 B.C. L.Rev. 463, 463–64 (2002) (noting that, because animal abuse is "highly related to other types of abuse in the same home," evidence of "prior animal abuse should be admissible under Federal Rule of Evidence 404(b) in criminal trials for child and domestic abuse, subject only to the Federal Rule of Evidence 403 balancing test"); *cf. People v. Farley*, 33 Cal.App.3d Supp. 1, 109 Cal.Rptr. 59, 62 (1973) ("It is obvious that the two cases cited . . . in respect to cruelty to children are the most closely analogous to our present case of cruelty to animals.").

¶ 34 We agree with this approach. In this case, evidence of animal abuse was relevant because the animals and K.B. were all prone to having urination accidents in the home, and the defendant's frustration with and vio-

7. *See Rath*, 44 P.3d at 1040, n. 5 (For CRE 404(b) purposes, "identity" references the question whether the accused committed the guilty act, a question which, in turn, "contains the subquestions of whether the act was committed by someone and whether, if so, the accused was the person who committed it. . . . ").

lent reaction to those accidents was very similar.

¶ 35 Even relevant evidence may, however, be excluded under CRE 403 as unfairly prejudicial. Evidence is "unfairly" prejudicial if it has " 'an undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.' " *Masters v. People,* 58 P.3d 979, 1001 (Colo.2002) (quoting *People v. Dist. Court,* 785 P.2d 141, 147 (Colo.1990)). For otherwise relevant evidence to be excludable, however, the danger of unfair prejudice must *substantially* outweigh the legitimate probative value of the evidence. CRE 403.

¶ 36 Affording, as we must on appeal, the maximum probative value that a reasonable fact finder might give the evidence and the minimum unfair prejudice to be reasonably expected, *People v. James,* 117 P.3d 91, 94 (Colo.App.2004), we cannot conclude that the trial court was compelled to exclude the evidence because it was of such a character that the jury would have overlooked its legitimate probative force due to an overmastering hostility toward defendant. Neither K.B. nor the animals were seriously injured, if injured at all, by defendant.

¶ 37 Thus, we perceive no abuse of the court's discretion in admitting the other act evidence involving K.B., the cats, and the puppy for the purpose of disproving an accident defense.

¶ 38 Our analysis so far has not addressed the other act evidence involving N.B. (i.e., angrily yelling at her once when she vomited in the house). In our view, the admissibility of this evidence presents a much closer question. We need not, however, decide it because, even if we assume that the court erred in admitting the evidence, the error would not warrant reversal.

¶ 39 Where a court erroneously admits other act evidence, the error will be disregarded as harmless unless there is a reasonable probability that the error contributed to the defendant's conviction. *Casias,* ¶ 61. "[A] reasonable probability" does not mean that it is "more likely than not" that the error caused the defendant's conviction; rather, it means only a probability sufficient to undermine confidence in the outcome of the case. *Id.* at ¶ 63.

¶ 40 To determine the extent to which erroneously admitted other act evidence contributed to a defendant's conviction, we consider a number of factors, including the impact of the evidence and the overall strength of the prosecution's case. *People v. Harris,* 2015 COA 53, ¶ 27, —— P.3d ——. "However, the single most important factor in determining whether an error was harmless is whether the case was close. If a case was close, there is a greater chance that the erroneously admitted evidence affected the jury's verdict. On the other hand, if the properly admitted evidence is sufficiently powerful, an appellate court can be fairly assured that the erroneously admitted evidence did not substantially sway the jury." *Id.* (citation omitted).

¶ 41 In our view, the evidence involving N.B. had little or no prejudicial impact, given (1) its similarity to the properly admitted evidence of defendant's actions vis-a-vis K.B., the cats, and the puppy; and (2) the strength of the prosecution's case against defendant.

¶ 42 In this latter regard, this was not a close case as to whether A.M.'s injuries were caused by an accident or by defendant:

- the doctors uniformly opined that A.M.'s injuries were not caused by an accident;
- although there was evidence that G.W. spanked A.M., there was no evidence that the spanking injured A.M. (indeed, defendant told his grandmother that A.M. was "fine" when he returned from the convenience store);
- G.W. testified that defendant slammed A.M. into the wall;
- the properly admitted evidence of other acts involving K.B., the cats, and the puppy tended to show that defendant caused A.M.'s injuries;
- defendant appeared indifferent to A.M.'s fate at the hospital, while A.M. was being flown away in a flight for life helicopter, and while he signed a form to donate her organs; and,
- defendant was overheard making statements about he and G.W. getting their

"stories straight" (i.e., that A.M. fell off a roof or against the stove) to explain A.M.'s injuries.

¶ 43 Because, in our view, the impact of any error in admitting the other act evidence involving K.B. would not undermine confidence in the outcome of the case, the error, if any, was harmless and would not warrant reversal.

## III. Child Abuse

¶ 44 Defendant contends that his conviction and sentence for child abuse must be reversed or vacated because (1) the court's elemental jury instruction on child abuse effected a constructive amendment of the charge contained in the indictment and (2) there was insufficient evidence of a causal connection between defendant's pattern of conduct and A.M.'s death. We are not persuaded.

### A. Constructive Amendment

■ ¶ 45 The statutory provision under which defendant was charged delineates three categories of child abuse, i.e., causing injury to a child's life or health; permitting a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health; or engaging in a continued pattern of conduct having certain effects:

> A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

§ 18–6–401(1)(a), C.R.S.2014.

¶ 46 Defendant was charged in the indictment with all three categories of abuse.

Varying slightly from the text of section 18–6–401(1)(a), however, the indictment *did not list* malnourishment and lack of proper medical care as the effects of defendant's continued pattern of conduct against A.M.[8]

¶ 47 The elemental instruction given to the jury did not reference the first two categories of abuse, but only the last one ("engaging in a continued pattern of conduct"). And, as pertinent here, the instruction included, among other things, the two statutory effects (malnourishment and lack of proper care) that had been omitted from the indictment.[9]

¶ 48 Defendant asserts that the inclusion of "malnourishment" and "lack of proper medical care" as possible statutory effects, or bases, upon which the jury could find him guilty of child abuse constituted a constructive amendment of the charges. We agree.

■ ¶ 49 Ordinarily, a trial court may instruct the jury consistently with the evidence presented at trial, *see People v. Silva,* 987 P.2d 909, 917 (Colo.App.1999) ("The trial court has a duty to instruct the jury properly concerning all the issues supported by the evidence."), and a prosecutor may comment on that evidence. *See Domingo–Gomez v. People,* 125 P.3d 1043, 1048 (Colo.2005) (prosecutor may argue reasonable inferences from the evidence). A court's instructions cannot, however, be permitted to "constructively amend" the charges by changing an element of the charged offense. *See People v. Rodriguez,* 914 P.2d 230, 257 (Colo.1996); *People v. Huynh,* 98 P.3d 907, 911 (Colo.App.2004).

¶ 50 As noted above, the child abuse statute delineates various ways in which a person can commit child abuse, including:

- engaging in a continued pattern of conduct that results in *malnourishment;* and

- engaging in a continued pattern of conduct that results in *lack of proper medical care,*

8. Thus, the indictment alleged that defendant unlawfully, feloniously, knowingly, or recklessly caused an injury to or permitted to be unreasonably placed in a situation that posed a threat of injury to the life or health of a child, namely, [A.M.], and engaged in a continued pattern of conduct that resulted in cruel punishment, mistreatment, or an accumulation of injuries that resulted in the death of the child in violation of 18–6–401(1)(a), (7)(a)(I), C.R.S.

9. The source of the instruction is unclear from the record.

¶ 51 Neither of these was alleged in defendant's indictment. Instead, the prosecutor charged him only with "[e]ngag[ing] in a continued pattern of conduct that result[ed] in ... *cruel punishment, mistreatment, or an accumulation of injuries that ultimately result[ed] in the death of*" A.M.—three other means of committing child abuse as a pattern of conduct. § 18–6–401(1)(a) (emphasis added).

¶ 52 Because the instruction expanded the bases upon which defendant could be convicted beyond those for which he was charged, the instruction constructively amended the indictment. *See People v. Weinreich*, 98 P.3d 920, 923 (Colo.App.2004) (constructive amendment occurred where "[t]he information charged one form of child abuse ... and the jury instruction stated another"), *aff'd*, 119 P.3d 1073 (Colo.2005); *see also People v. Petschow*, 119 P.3d 495, 503–04 (Colo.App. 2004) (constructive amendment occurred where the information charged the defendant with one form of aggravated motor vehicle theft, but the elemental instruction added an alternative element that defined an uncharged crime).

■ ¶ 53 The remaining question, though, is whether defendant is entitled to a new trial on this ground. In many instances, the answer would be "yes." *See Huynh*, 98 P.3d at 911 ("[A] constructive amendment to the charges is reversible per se."). But because defendant did not object in the trial court to the jury instruction, reversal is not warranted, even on constructive amendment grounds, in the absence of plain error. *Weinreich*, 119 P.3d at 1078.

¶ 54 To qualify as plain error, an error must be both "obvious and substantial." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116. This means that an error must be so clear-cut that a trial judge should have been able to avoid it without benefit of objection, *People v. Pollard*, 2013 COA 31M, ¶ 39, 307 P.3d 1124, and that it must be "seriously prejudicial," that is, it must have so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the defendant's conviction, *Hagos*, ¶ 14.

¶ 55 Even if we assume the error was obvious, it was not "seriously prejudicial."

As argued by the People, the constructive amendment would have had little, if any, effect on the jury's verdict on the child abuse count because there was no evidence in the record suggesting that defendant engaged in a continued pattern of conduct resulting in malnourishment or lack of proper medical care.

¶ 56 There was evidence of only two types of conduct that could even relate to the concepts of malnourishment and lack of proper medical care:

- defendant (or G.W.) would punish A.M. if she snuck into the refrigerator to get food or water without asking; and

- defendant and G.W. may have attempted to treat A.M.'s head injury with an ice pack and tissues before taking her to the hospital, although G.W. denied doing so.

¶ 57 These facts could not support a finding of a continued pattern of conduct involving malnourishment or lack of proper medical care. To say that A.M. had been punished for sneaking food is not the same as saying she was malnourished; to the contrary, the autopsy report—which was admitted into evidence—described A.M. as "a well-developed, well-nourished female." And the lack of proper medical care on one occasion would not establish a "pattern," within the common and ordinary meaning of that term. *See State v. Sanchez–Diaz*, 683 N.W.2d 824, 832 (Minn.2004) (Although the domestic abuse statute does not "specify a minimum number of incidents which must be proven in order to find a 'pattern'[,] ... a lone act ... cannot constitute a pattern." (internal quotation marks omitted)); *see also People v. Simon*, 266 P.3d 1099, 1108 (Colo.2011) ("A 'pattern' simply describes a series of two or more discrete acts....").

¶ 58 Although the prosecutor pointed out both of these facts during opening and closing argument, she never asserted that they supported malnourishment or lack of proper medical care as a basis for finding the prescribed pattern of conduct. Instead, she used this evidence only to argue that defendant had mistreated A.M. and was reluctant to seek medical care outside of the home,

even after realizing she was seriously injured.

¶ 59 Because the jury was given no evidentiary basis upon which to find defendant guilty of "engag[ing] in a continued pattern of conduct that resulte[d] in malnourishment, [or] lack of proper medical care," § 18–6–401(1)(a), the jury likely disregarded the challenged parts of the instruction rather than forcing the evidence to fit those parts. *See People v. Manzanares,* 942 P.2d 1235, 1241–42 (Colo.App. 1996) (where there was no evidence that the defendant initiated the fight and the prosecutor did not mention the instruction in closing argument, unwarranted initial aggressor instruction was harmless). Certainly, no plain error was occasioned by the erroneous inclusion of the superfluous terms (i.e., "malnourishment" and "lack of proper care") in the elemental instruction on child abuse. *Cf. People v. Ujaama,* 2012 COA 36, ¶ 50, 302 P.3d 296 (no plain error in including superfluous limitations on the right to exercise self-defense in self-defense instruction).

### B. Sufficiency of the Evidence

¶ 60 Defendant contends that the evidence is insufficient to support his conviction because, although the jury was instructed on the "engaging in a continuing pattern" category of child abuse, there was no proof that A.M.'s death was caused by the cumulative effects of the pattern(s) of abuse in which he engaged, as opposed to a discrete act—allegedly slamming her head into the wall.

¶ 61 The People concede that A.M. died from her brain injury, which was the result of a single blow to the head. But, they argue, outside of the accumulation of injuries part (which is inapplicable here), section 18–6–401(1)(a) is not concerned with the "cumulative effects" of a pattern of abuse; it requires only proof of an enumerated pattern of abuse,[10] other than that involving an accumulation of injuries, and, once the pattern is shown, proof that any one or more of the acts underlying the pattern caused death (or injury) to a child will support an enhanced sentence under section 18–6–401(7)(a). Consequently, the People assert, section 18–6–401(1)(a) and (7)(a) were satisfied by evidence that defendant engaged in an enumerated pattern of abuse which culminated in a single act (slamming A.M.'s head against the wall) that resulted in A.M.'s death.

¶ 62 The precise sufficiency of evidence issue raised by defendant, and responded to by the People, turns on an issue of statutory interpretation, which is a question of law that we must independently determine. *See People v. Campos,* 2015 COA 47, ¶ 10, 351 P.3d 553.

¶ 63 In interpreting a statute, our task is to ascertain and give effect to the intent of the General Assembly. *Dubois v. People,* 211 P.3d 41, 43 (Colo.2009). To discern the legislative intent, we look first to the language of the statute itself, *People v. Summers,* 208 P.3d 251, 253–54 (Colo.2009), reading words and phrases in context and construing them according to rules of grammar and common usage. *People v. Diaz,* 2015 CO 28, ¶ 12, 347 P.3d 621.

¶ 64 "When the statutory language is clear and unambiguous, we interpret the statute as written without resort to interpretive rules and statutory construction." *People v. Apodaca–Zambori,* 2013 COA 29, ¶ 16, —— P.3d ——. But "[w]hen the language of a statute is susceptible of more than one reasonable understanding and is therefore considered ambiguous," *People v. Jones,* 2015 CO 20, ¶ 10, 346 P.3d 44, "a court must look beyond the language [of the statute] and consider other factors, such as the statute's legislative history and the objective sought to be achieved by the legislation," *People v. Lovato,* 2014 COA 113, ¶ 23, 357 P.3d 212.

¶ 65 Section 18–6–401(1)(a) provides, as pertinent here, that

[a] person commits child abuse if such person . . . engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death

---

**10.** In the preceding section, we referenced such a pattern as one having certain "statutory ef-

fects."

of a child or serious bodily injury to a child.

¶ 66 Defendant would have the last phrase ("that ultimately results in the death of a child or serious bodily injury to a child") apply to each of the enumerated "patterns of conduct" (i.e., those causing malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries). The People would have that phrase apply only to the last pattern of conduct (i.e., that causing an accumulation of injuries).

¶ 67 Under the rule of grammar known as the last antecedent rule, "relative and qualifying words and phrases, where no contrary intention appears, are construed to refer solely to the last antecedent with which they are closely connected." *People v. McPherson,* 200 Colo. 429, 432, 619 P.2d 38, 40 (1980), *abrogated on other grounds by People v. Crump,* 769 P.2d 496, 499 (Colo.1989); *see People in Interest of O.C.,* 2012 COA 161, ¶ 26, 312 P.3d 226 (last antecedent rule "provides that in the absence of a contrary intention, referential and qualifying words or phrases refer solely to the immediately preceding clause"). Under that rule, the last phrase would, as the People argue, apply only to the last enumerated pattern of abuse.

¶ 68 However, that rule, though well-established in Colorado law, was repudiated as a basis for decision by the General Assembly in 1981. *See* § 2–4–214, C.R.S. 2014; *People v. O'Neal,* 228 P.3d 211, 214–15 (Colo.App.2009) (reciting the history of the rule in Colorado). Consequently, we cannot presume that the legislature intended that the last phrase apply only to the last enumerated pattern of abuse. *See People v. Stroud,* 2014 COA 58, ¶ 21, 356 P.3d 903. Nor, however, can we presume that the last phrase applies to all of the previously enumerated patterns of abuse. *See People v. Trujillo,* 251 P.3d 477, 480 (Colo.App.2010) ("[S]ection 2–4–214 does not create a ... presumption that qualifying words apply to all preceding words or phrases.").

¶ 69 Because the last phrase could be read as applying either to all of the enumerated patterns of abuse or only to the last one, the statute is ambiguous. *Compare People v. Friend,* 2014 COA 123M, ¶ 60, —— P.3d —— (concluding that, under section 18–6–401(1)(a), each of the enumerated patterns of conduct must ultimately result in death or serious bodily injury to a child), *with People v. Baca,* 852 P.2d 1302, 1306 (Colo.App.1992) (stating, in dicta, that only the pattern of abuse resulting in an accumulation of injuries must ultimately result in death or serious bodily injury). And, because the statute is ambiguous, we can look to legislative history to ascertain what the General Assembly intended to achieve by its enactment.

¶ 70 The statute's legislative history reveals that the last phrase of section 18–6–401(1)(a) ("ultimately results in the death of a child or serious bodily injury to a child") applies only to the last enumerated pattern of abuse ("an accumulation of injuries").

¶ 71 The part of section 18–6–401(1)(a) beginning with "engaging in a continued abuse pattern" and continuing until the end of the sentence was added by H.B. 91–1229. During a meeting of the House Judiciary Committee, the bill's sponsor, Representative Faye Fleming, stated the language originated in a division of this court's opinion in *People v. Barela,* 689 P.2d 689, 690–91 (Colo. App.1984). *See Hearings on H.B. 91–1229 by the H. Judiciary Comm.,* 58th Gen. Assemb., 2d Sess. (1991) (statement of Rep. Faye Fleming); *see also Idowu v. Nesbitt,* 2014 COA 97, ¶ 36, 338 P.3d 1078 (Courts give " 'substantial weight to the sponsors' statements concerning a bill's purpose.' " (quoting *People v. Miller,* 97 P.3d 171, 174 (Colo.App.2003))).

¶ 72 In *Barela,* the defendant was convicted of manslaughter and felony child abuse. The defendant's infant child had died from severe cerebral edema (a progressive swelling of the brain caused by blunt trauma). Also, he had (1) suffered six broken ribs and three subdural hematomas that had occurred approximately a month before he died and (2) been malnourished. *See* 689 P.2d at 690.

¶ 73 On appeal, defendant challenged the trial court's denial of a bill of particulars on the manslaughter count—that she "recklessly caused the death of her son" during a six-week period prior to his death—and the child

abuse count—that, "during that same time period, [she] cruelly punished and placed the child in a situation that endangered his life and health intentionally, negligently, and knowingly." *Id.* at 690–91.

¶ 74 A division of this court held that the trial court did not abuse its discretion in denying a bill of particulars because

> [with regard to the manslaughter count,] the evidence in this case showed that not one single act, but rather, several successive acts of defendant, contributed to [the child]'s death. Thus, there was evidence of continuing conduct of defendant which resulted in an accumulation of injuries and which eventually resulted in [the child]'s death.
>
> Regarding the charge of felony child abuse, there was evidence of a continued pattern of conduct which resulted in malnourishment, lack of proper medical care, cruel punishment and mistreatment.

*Id.* at 691.

¶ 75 Thus, the division in *Barela* made a clear distinction between "a continued pattern of conduct which resulted in malnourishment, lack of proper medical care, cruel punishment and mistreatment" for child abuse and "continuing conduct of defendant which resulted in an accumulation of injuries and which eventually resulted in [the child]'s death" for manslaughter. *Id.*

¶ 76 The General Assembly's reliance on *Barela* as the source for the added language in the child abuse statute reflects, in our view, an intent, as in *Barela*, to maintain the distinction between the one type of pattern whose cumulative effect must cause death (or serious bodily injury) and the other types of patterns which need not have that result.

¶ 77 Our conclusion is supported by the testimony of Jill–Ellyn Straus, who addressed, on behalf of the Colorado District Attorneys Council, the purpose of H.B. 91–1229. In a Senate Judiciary Committee meeting, Ms. Straus stated that the new language was intended to allow prosecutors to file a single charge of child abuse covering multiple acts of a similar nature rather than filing a separate charge for each act. *See Hearings on H.B. 91–1229 by the S. Judiciary Comm.*, 58th Gen. Assemb., 2d Sess. (1991) (statement of Jill–Ellyn Straus); *see also People v. Cito*, 2012 COA 221, ¶¶ 21‑22, 310 P.3d 256 (giving weight to the legislative testimony of two witnesses from the Colorado District Attorneys Council). She distinguished between the types of enumerated patterns of abuse, stating, for example, that a "failure to thrive" type of charge could be based on a pattern of conduct resulting in malnutrition. She did not mention the need to show death or serious bodily injury to the child in connection with that type of pattern.

¶ 78 In contrast, she explained that "where a child suffers a series of injuries over time," and each injury might not warrant a child abuse charge, the amended statute would allow for the prosecution of that series of acts when they ultimately result in a serious bodily injury or death.

¶ 79 From this legislative history, we conclude that the last phrase "ultimately results in the death of a child or serious bodily injury to a child" in section 18–6–401(1)(a) applies to only the last enumerated pattern of abuse ("an accumulation of injuries"). The other enumerated patterns of abuse do not require a showing that they resulted in death or serious bodily injury.[11]

¶ 80 Thus, under section 18–6–401(1)(a), the prosecution needed to prove only that defendant engaged in a pattern of conduct resulting in, as alleged and proven here, cruel punishment or mistreatment of A.M. To enhance the sentence for the crime, though, the People had to separately prove that one or more acts underlying that pattern resulted in death or injury to the child. § 18–6–401(7)(a).

¶ 81 In this case, the People presented ample evidence that defendant engaged in a pattern of conduct that resulted in mistreatment and cruel punishment of A.M. Witnesses testified that A.M. was afraid of de-

---

11. To the extent that this interpretation differs from that in *People v. Friend*, 2014 COA 123M, —— P.3d ——, we decline to follow *Friend*. *See People v. Thomas*, 195 P.3d 1162, 1164 (Colo. App. 2008) (one division of the court of appeals is not bound by a decision of another division of the court).

fendant; other witnesses testified that they had seen defendant scream at A.M., hold her, naked, under a cold water spigot, shake her, shove her, and slam her against a wall. Still other witnesses testified that A.M.'s body was covered in bruises, she had bruised lungs and a healing rib fracture, and she had suffered a subdural hematoma from defendant slamming her against the wall. From this evidence, a reasonable juror could infer that defendant engaged in patterns of mistreatment and cruel punishment under section 18–6–401(1)(a). In other words, to establish the substantive offense, the prosecution was not required, as defendant argues, to prove that the pattern—as opposed to a discrete incident—caused A.M.'s death.

¶ 82 Moreover, the prosecution presented ample evidence that an act which was part of these patterns (slamming A.M. into the wall) caused her death. Because these patterns of abuse both resulted in mistreatment and cruel punishment and culminated in A.M.'s fatal head injury, the evidence was sufficient to support a finding that defendant's abuse of A.M. resulted in her death for purposes of sentencing under section 18–6–401(7)(a).

¶ 83 Consequently, we conclude that the evidence was sufficient to support the conviction and sentence for child abuse.

### IV. Expert Testimony

¶ 84 Defendant contends that the trial court erred in permitting expert medical testimony that (1) usurped the jury's factfinding role by stating that A.M.'s injuries were the result of "nonaccidental trauma," thus implying that they were knowingly or recklessly inflicted; and (2) compared A.M.'s injuries to those resulting from irrelevant accident scenarios. We are not persuaded.

¶ 85 At trial, four medical experts testified that A.M.'s injuries were nonaccidental in nature:

- The emergency room physician who first treated A.M. testified that he believed her injuries were nonaccidental, and that it was "highly, highly, unlikely" that they were caused by an accident, "[b]ut possible."

- A pediatrician who specialized in child abuse diagnosed A.M. as having suffered nonaccidental child abuse trauma.

- The chief of pediatric neurosurgery who treated A.M. and performed her brain surgery stated that her injuries were "unequivocally" caused by nonaccidental trauma.

- A forensic pathologist testified that A.M. was a battered child whose injuries did not appear to be accidental and could not have occurred from falling, and that her skull fracture was likely caused by "a bat or a pipe" or "something broader."

¶ 86 Additionally, three experts equated A.M.'s injuries to those occurring in a car accident or another high-impact accident:

- The pediatrician stated that A.M.'s injuries could only have been caused by "a very severe mechanism," such as "[a] really bad car accident[ ]," and that her rib fracture was an "impact injury" resulting from a "high impact," such as a car accident or running into a tree while skiing.

- The chief of pediatric ophthalmology who treated A.M. testified that A.M.'s eye injury was "a high velocity injury" caused by something such as a car accident, falling from a great height, or a serious crush injury.

- The forensic pathologist testified that the bleeding in A.M.'s brain was caused by a force similar to a car accident.

¶ 87 Defendant did not object to any of this testimony. Accordingly, we review his contentions for plain error. See Ujaama, ¶ 38.

### A. Usurping the Jury's Role

¶ 88 An expert may offer testimony that embraces an ultimate issue to be decided by the trier of fact. CRE 704. An expert may not, however, usurp the factfinding function of the jury. People v. Rector, 248 P.3d 1196, 1203 (Colo.2011).

¶ 89 In determining whether an expert has usurped the jury's function, courts "examine a number of factors ... including but not limited to, whether": (1) the testimony was clarified on cross-examination; (2) the testimony expressed an opinion of the

applicable law or legal standards, thereby usurping the function of the court; (3) the jury was properly instructed on the law and that it may accept or reject the expert's opinion; and (4) an expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime. *Id.*

¶ 90 As pertinent here, a medical expert may testify in a child abuse case regarding whether a child's injuries constitute *medical* child abuse so long as (1) he or she does not give an opinion on whether or not the defendant inflicted the injuries or whether the injuries fit the *legal* definition of child abuse and (2) the jury is properly instructed that it may accept or reject the opinion. *See id.* An expert may also give an opinion as to how a victim received his or her injuries and whether a defendant's explanation of those injuries is plausible. *See Friend,* ¶ 33 (Expert testimony "helped the jury determine whether [the child victim]'s death was caused by accidental or nonaccidental trauma.").

¶ 91 Although the pediatrician testified that she had diagnosed A.M. with physical child abuse, neither she nor any of the other experts in this case gave an opinion regarding whether defendant inflicted A.M.'s injuries or whether those injuries fit the legal definition of child abuse. Instead, they testified only that A.M.'s injuries were caused by nonaccidental trauma, thus discrediting defendant's assertion that A.M.'s injury resulted from a fall against the stove. Further, the jury was properly instructed that it could accept or reject the experts' opinions.

¶ 92 Consequently, we discern no error, let alone plain error, in the admission of expert testimony that A.M. had been subjected to child abuse and nonaccidental trauma. *See Rector,* 248 P.3d at 1203 (holding that it was not plain error to admit the testimony of a doctor regarding his medical diagnosis of child abuse, without instructing the jury on the different definitions of medical and legal child abuse).

### B. Accident Scenarios

¶ 93 Expert testimony is generally admissible if (1) the scientific principles underlying the testimony are reasonably reli-

able; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury; and (4) the evidence satisfies CRE 403. *Id.* at 1200; *see also* CRE 702.

¶ 94 Defendant argues that the expert testimony comparing the force required to cause A.M.'s head injury to that involved in car accidents and other high-impact accidents was inadmissible because it was not helpful to the jury. *See Rector,* 248 P.3d at 1200 (expert testimony is generally admissible if, among other things, it will be helpful to the jury).

¶ 95 "Helpfulness to the jury hinges on whether the proffered testimony is relevant to the particular case: whether it 'fits.' Fit demands more than simple relevance; it requires that there be a logical relation between the proffered testimony and the factual issues involved in the litigation." *People v. Martinez,* 74 P.3d 316, 323 (Colo.2003).

¶ 96 Contrary to defendant's assertion, the expert testimony comparing the force that caused A.M.'s injury to that of various accidents was logically related to factual issues in the case. In his statements to the police, defendant had asserted that A.M.'s head injury was the result of an accidental fall into a stove. Thus, expert testimony regarding the amount of force necessary to cause such an injury was logically related to whether the accident alleged here could have produced such force and served as the basis for the experts' opinions that the injuries were not accidental. *See id.* at 324 (Similar testimony regarding accident scenarios was admissible as the basis for the expert's opinion because it "assists the jury in better understanding the nature of a subdural hematoma: that it occurs only in a few known situations. Similarly, the jury understands that a simple fall is unlikely to cause a subdural hematoma.").

¶ 97 Consequently, the court did not abuse its discretion in permitting this testimony.

### V. Request for Substitution of Counsel

¶ 98 Finally, defendant contends that the court deprived him of his right to conflict-free counsel, to present a defense, and to

testify when it denied his midtrial request for a substitution of counsel. We disagree.

¶ 99 To obtain substitute counsel, a defendant must have " 'some well[-]founded reason for believing that the appointed attorney cannot or will not competently represent him.' " *People v. Kelling*, 151 P.3d 650, 653 (Colo.App.2006) (quoting 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, *Criminal Procedure* § 11.4(b), at 555 (2d ed. 1999)).

¶ 100 In evaluating a request for substitute counsel, we employ a four-factor inquiry into (1) the timeliness of the motion; (2) the adequacy of the court's inquiry into the defendant's complaint; (3) whether the attorney-client conflict is so great that it resulted in a total lack of communication or otherwise prevented an adequate defense; and (4) the extent to which the defendant substantially and unreasonably contributed to the underlying conflict with his attorney. *People v. Bergerud*, 223 P.3d 686, 695 (Colo. 2010).

¶ 101 We review a trial court's decision to deny substitute counsel for an abuse of discretion. *Id.* at 696 n. 4.

¶ 102 Shortly before the close of the prosecution's case-in-chief, the prosecutor indicated that she intended to introduce recent "jail calls" between defendant and his grandmother that appeared to undermine his theory that G.W. had caused A.M.'s injuries. In those calls, he had indicated that A.M. had been "fine" when he came home from the convenience store and that the flopping story was not true.

¶ 103 Defense counsel requested and was granted a hearing pursuant to *Bergerud*. During the hearing, defense counsel explained that the "jail calls" had created a conflict because defendant wanted to change his theory of defense. Further, counsel explained:

- early in the case, defendant had informed the defense investigator that he wanted to tell the jury his "side of the story," which appears to have somehow implicated G.W.'s stepfather in A.M.'s death, but

defense counsel did not view that as a viable strategy;

- defendant had agreed with the defense being asserted at trial, and that his "side of the story" was inconsistent with that defense;

- defendant could not present his story without defense counsel being called as a witness to rebut the charge that he had recently fabricated it;

- defendant could not testify without the prosecutor soliciting evidence of his prior felony convictions; and

- given these developments, counsel was concerned about his ability to discharge his obligations to defendant.

¶ 104 The trial court determined, in an extensive written order, that the alleged conflict of interest did not implicate his constitutional rights to effective counsel, to remain silent, and to call witnesses. Specifically, the court addressed each *Bergerud* factor and recognized:

- Defendant's attorneys could not be called as witnesses at a future trial if a mistrial was granted because their statements would be hearsay.

- Potentially more harmful statements from defendant could be tendered into evidence if the court allowed his attorneys to testify.

- Defendant caused the conflict with his attorneys by his late assertion of problems with counsel's strategies.

- Defendant chose to express his disagreement with defense counsel to a third party (thus making the telephone calls admissible at trial).

- Defendant could still testify and corroborate his altered defense theory by calling the former defense investigator to testify.

¶ 105 As a precaution, the trial court appointed alternate defense counsel to advise defendant about his right to testify and his right to call the former defense investigator as a witness.

¶ 106 On the last day of trial, defendant was again advised of his right to testify, and said that he had met with alternate defense counsel and was advised of his right to re-

main silent. Despite some hesitation by defendant, the trial court found that he had waived his right to testify.

¶ 107 On appeal, defendant argues that the trial court "improperly elevated concerns about the timing of the request and defendant's alleged role in contributing to the conflict over the very real and substantial concerns about whether defendant could exercise his right to testify if his public defenders remained on the case" and that they "effectively nullified [his] right to testify" with their asserted theory of defense.

¶ 108 Contrary to defendant's assertion, this division recently concluded that there is a lack of authority "holding that . . . an actual conflict arises when trial counsel pursues a strategy that would impede a defendant's right to testify, even over the defendant's protest." *People v. Thomas*, 2015 COA 17, ¶ 18, —— P.3d ——. Instead, " 'the defendant must identify something that counsel chose to do or not do, as to which he had conflicting duties, and must show that the course taken was influenced by that conflict.' " *Id. at* ¶ 19 (quoting *Stroud*, ¶ 40). Here, as in *Thomas*, defendant has not identified any "conflicting duties or interests that burdened his trial counsel" in deciding to advance the theory that G.W. caused A.M.'s injuries. *Id.* Thus, he did not establish an actual conflict of interest.

¶ 109 In any event, the court explicitly considered each of the *Bergerud* factors, and acted within its discretion in giving weight to the fact that defendant changed his mind about the appropriate theory of defense only after agreeing to the one recommended by defense counsel, allowing that theory to be presented to the jury, hearing most of the evidence against him, and giving the prosecution further ammunition to undermine the previously agreed-upon defense strategy in the recorded telephone calls. *See Bergerud*, 223 P.3d at 695–97 (court should "not only consider whether the defendant's request was late in coming, and so would seriously inconvenience witnesses or otherwise disrupt the orderly administration of justice, but

should also establish the cause for any delay and whether responsibility for the delay lies with the defendant or with his lawyers. . . . The months invested in preparing for the trial, and the burdens already placed on the lives of witnesses, should not be lightly tossed aside once the trial has begun."); *cf. People v. Rubanowitz*, 688 P.2d 231, 243 (Colo.1984) ("[A] defendant may not by his own conduct force a declaration of mistrial."); *People v. Burke*, 937 P.2d 886, 889 (Colo.App. 1996) (same).

¶ 110 And because defendant could have testified as to his "side of the story" and called the former defense investigator as a witness to rebut a claim of recent fabrication, the alleged conflict did not deprive defendant of the right to testify and call witnesses.

¶ 111 Consequently, we discern no error in the court's denial of defendant's request for new counsel.

### VI. *Conclusion*

¶ 112 The judgment of conviction is affirmed.

Webb and Plank *, JJ., concur